

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-1995

# Harris v City of Phila

Precedential or Non-Precedential:

Docket 93-1997

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Harris v City of Phila" (1995). *1995 Decisions.* Paper 47.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/47

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


Nos. 93-1997, 93-2116 and 93-2117


MARTIN HARRIS; JESSE KITHCART; WILLIAM DAVIS;
RANDALL CUMMINGS; EVELYN LINGHAM; ESTRUS FOWLER
TYRONE HILL and NATHANIEL CARTER

v.

THE CITY OF PHILADELPHIA; JOAN REEVES, in her
official capacity as Commissioner of The Department
of Human Services of the City of Philadelphia;
ALBERT F. CAMPBELL; ROSITA SAEZ-ACHILLA;
GENECE E. BRINKLEY, ESQ.; REV. PAUL M. WASHINGTON;
M. MARK MENDEL; HON. STANLEY KUBACKI; MAMIE FAINES,
each in his or her official capacity as a member
of the Board of Trustees of the Philadelphia Prison System;
J. PATRICK GALLAGHER, in his official capacity as
Superintendent of the Philadelphia Prison System;
HARRY E. MOORE, in his official capacity as
Warden of Holmesburg Prison;
WILHELMINA SPEACH, in her official capacity
as Warden of the Detention Center;
PRESS GROOMS, in his official capacity as
Warden of the House of Corrections;
RAYMOND E. SHIPMAN, in his official capacity
as Managing Director of the City of Philadelphia; and
MAYOR EDWARD G. RENDELL, in his official capacity as
Mayor of the City of Philadelphia

Theodore Levine, Albert F. Campbell, Rosita Saez-Achilla,
Genece E. Brinkley, Esq., Rev. Paul M. Washington,
M. Mark Mendel, Esq., Hon. Stanley Kubacki,
Mamie Faines, J. Patrick Gallagher, Harry E. Moore,
Wilhelmina Speach, Press Grooms, Raymond E. Shipman,
Hon. Edward G. Rendell and the City of Philadelphia
                                          Appellants


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 82-cv-01847)

Argued September 14, 1994

Before:  SLOVITER, <u>Chief</u> <u>Judge</u>, MANSMANN and
         ALITO, <u>Circuit</u> <u>Judges</u>

(Filed February 15, l995 )

Mark A. Aronchick  (Argued)
Gary A. Rosen
Randy K. Hubert
Hangley, Connolly, Epstein,
 Chicco, Foxman & Ewing
Philadelphia, PA  19102

James B. Jordan
Office of City Solicitor
Philadelphia, PA  19102

        Attorneys for Appellants

Sarah B. Vandenbreak
Office of District Attorney
Philadelphia, PA  19102

        Attorney for Amicus-Appellant Lynne Abraham

David Richman  (Argued)
Pepper, Hamilton & Scheetz
Philadelphia, PA  19103-2799

        Attorney for Appellees

OPINION OF THE COURT

SLOVITER, Chief Judge.

The lawsuit that underlies these appeals arises out of the decade-long efforts of a class of incarcerated prisoners to ameliorate the severe overcrowding and harsh conditions existing in the prisons maintained and supervised by the City of Philadelphia, Pennsylvania (hereafter Philadelphia or City). The Philadelphia defendants have not contested the need for substantial and meaningful improvements. Indeed, they entered into two consent decrees and stipulated revisions thereto in which they agreed to make massive improvements and agreed to have the district court supervise the steps they planned to implement those improvements. It is also not contested that Philadelphia did not meet the deadlines for some of the obligations it undertook in the consent decrees and stipulations. Ultimately, because of Philadelphia's failure to comply, the district court entered the series of orders which are the subject of these appeals.[1]

_____

1  In prior appeals we reversed the district court's dismissal of the case on res judicata and abstention grounds; Harris v. Pernsley (Harris I), 755 F.2d 338 (3d Cir.), cert. denied, 474 U.S. 965 (1985), and twice affirmed the district court's denial of the District Attorney's motion to intervene in this proceeding. See Harris v. Pernsley (Harris II), 820 F.2d 592 (3d Cir.), cert. denied, 484 U.S. 947 (1987); Harris v. Reeves (Harris III), 946 F.2d 214 (3d Cir. 1991), cert. denied, 112 S. Ct. 1516 (1992).

Before us in this opinion is the City of Philadelphia's appeal from the order of October 5, 1993 imposing on it stipulated penalties totalling $584,000 (No. 93-1997), the order of October 28, 1993 directing production of the Facilities Audit (No. 93-2116), and the order of November 1, 1993 dismissing the City's Motion to Modify the December 30, 1986 Decree and the March 11, 1991 Decree as a contempt sanction for the City's failure to timely submit the Facilities Audit and Ten-Year Plan by the dates previously stipulated (No. 93-2117).

These appeals were consolidated for argument with three related appeals. The appeal from the injunction entered by the district court governing the occupancy and conditions of confinement of the City's newly constructed prison facility denominated the Alternative and Special Detention Central Unit (No. 93-2034) was remanded to the district court because the issues raised by the City on appeal had not been raised by it in the district court. See Harris v. City of Philadelphia (Harris IV), 35 F.3d 840 (3d Cir. 1994). Still pending and the subject of separate opinions filed today are the appeal from an order adjudicating the City in contempt and imposing fines for noncompliance with an order requiring occupancy of a substance abuse and treatment facility, Harris v. City of Philadelphia, No. 94-1286 (3d Cir. ____, 1995) (Harris VI), and the appeal from another order adjudicating the City in contempt and imposing on it fines for its modification of procedures for designation of bailable pretrial detainees for release, Harris v. City of Philadelphia, No. 93-1988 (3d Cir. ____, 1995) (Harris VII).

None of these appeals directly challenges the stipulated maximum allowable population of prisoners to be housed, although that issue remains the raison d'être of all the orders and decrees that followed. The three appeals that are the subject of this opinion instead concern the comprehensive Prison Planning Process (PPP) agreed to in the 1991 Consent Decree as an orderly planning process for the construction, operation and management of the Philadelphia prison system. Necessarily implicated in this series of appeals is the role of the district court in overseeing the administration of county prison facilities pursuant to a consent decree designed to ameliorate overcrowding, and the use of its contempt power for alleged noncompliance with orders voluntarily undertaken.

## I.

### BACKGROUND OF THE CASE AND THE CONSENT DECREES

In 1982 a group of inmates suffering from overcrowding at Holmesburg Prison filed a class action pursuant to 42 U.S.C. §§ 1983 and 1988 claiming violations of the First, Eighth, Ninth and Fourteenth Amendments against the City of Philadelphia and individual city officials who were responsible for administering the Philadelphia prison system. An amended complaint filed April 19, 1983 asserted claims for constitutional deprivation under the Eighth and the Fourteenth Amendments pursuant to 42 U.S.C. § 1983. In 1986, the lawsuit was expanded from its focus on Holmesburg Prison to encompass the Philadelphia prison system as a whole, and the plaintiff class was enlarged to include all past, present and future inmates in the Philadelphia prison

system.[2]  We have been advised by counsel that the inmates are both pretrial detainees (on either nonbailable offenses or who cannot post the required bail) and sentenced prisoners, in approximately equal proportions.  Argument Transcript at 6.

In late 1986, the inmates negotiated a settlement with the City in which they gave up their claims for damages in return for, inter alia, the construction of a 440-bed detention facility in downtown Philadelphia by December 31, 1990 and a maximum allowable population for the then-existing facilities of the Philadelphia prison system.  App. at 91-92.  On December 30, 1986, the district court approved the settlement and the next day entered a Consent Order (the "1986 Consent Decree") consistent with its terms.

By 1989 it became clear that the 440-bed detention facility would not be available by December 31, 1990.  In an attempt to alleviate the continued overcrowding, the City and the plaintiff class negotiated an agreement which strengthened

---

[2]  In a somewhat parallel action, the Philadelphia Court of Common Pleas found some twenty years ago that conditions in the Philadelphia prison system violated the prohibitions against cruel and unusual punishment in the Eighth Amendment to the United States Constitution.  That court retains control over aspects of the prison system primarily related to prison conditions pursuant to a consent decree entered thereafter by the City and representatives of that plaintiff class.  See Jackson v. Hendrick, No. 71-2437 (Pa. Ct. of Common Pleas, Apr. 7, 1972), aff'd, 309 A.2d 187 (Pa. Commw. Ct. 1973), modified on other grounds, 321 A.2d 603 (Pa. 1974).  In 1986, the Pennsylvania Supreme Court reviewing a subsequent remedial decree noted that as a result of subsequent actions taken there were "vast improvements in prison conditions."  See Jackson v. Hendrick, 503 A.2d 400, 407 (Pa. 1986).

population control measures, renewed the City's commitment to new prison construction, and required the City to plan rationally to meet the needs of existing and future inmates. The parties submitted this proposed stipulation to the district court for approval, see Supp. App. at 1535, 1693, which was not forthcoming.[3] Consequently, on February 14, 1990, the plaintiff class moved to vacate the 1986 Consent Decree and to reinstate the Second Amended Complaint. See Supp. App. at 1674-1703. The City opposed this motion and urged the court to consider that it had already agreed to devise a comprehensive prison plan dealing with ten-year population projections, prison construction and renovation, management and training, information systems, incarceration alternatives, and state court reforms, and had already spent $250,000 on consultants to help meet its responsibilities. See Supp. App. at 1524-51. On August 31, 1990 the plaintiff class moved the court for emergency relief from the continued overcrowding. In its response, the City concurred in the relief suggested and informed the court that the City had formulated a Prisons Master Plan as well as a Justice Facilities and Systems Improvement Strategy. Supp. App. at 1542-43.

Continued negotiation led the parties to enter into a new Stipulation and Agreement culminating in another Consent Order approved by the district court (the "1991 Consent Decree"), this one considerably more detailed, which contained a series of

---

[3] Neither party has offered an explanation, and in light of subsequent events it is no longer relevant.

stipulations and remedial steps aimed at alleviating the overcrowding in the prison system.[4] In the 1991 Consent Decree, the parties stipulated that

> 4. New prison construction is inadvisable without detailed consideration of the future demands to be made on the Philadelphia prison system in light of: City population trends; trends in the crime rate; the habitability of existing prison facilities and the feasibility of their rehabilitation; the likelihood and effect of changes in the administration of criminal justice in Philadelphia; and the availability of alternatives to confinement.
>
> 5. Once the immediate and longer-range needs of the Philadelphia Prison System are determined realistically, how best to meet those needs should be addressed in a rational planning process.

App. at 113.

As a long-term solution, the parties agreed to undertake a comprehensive Prison Planning Process, which entailed evaluation of the current facilities and a carefully considered long-range plan in addition to the construction of new facilities and the repair of existing facilities. The parties also agreed to short-term remedies, one relating to a revised admissions moratorium and release mechanism and the other relating to the City's undertaking to provide a substance abuse program.

With respect to the long-term solution, Paragraphs 11-15 of the 1991 Consent Decree oblige the City to implement the Prison Planning Process and the Mayor to appoint a Criminal

---

[4] The City agreed to construct a facility or facilities "capable of housing in the aggregate at least 1000 inmates by May 25, 1994." ¶ 14, App. at 115. The parties stipulated that the City's obligation to construct a 440-bed downtown facility was thereby superseded. ¶ 12, App. at 115.

Justice Project Coordinator responsible for carrying out the activities specified in the Prison Planning Process.  App. at 114-15.  The Prison Planning Process addresses not only the physical plant of the Philadelphia prison system but also the operational aspects of running the prison system.  It includes population projections, a population management plan, promulgation of physical and operational standards, a capital projects management plan, an operational management plan, and a management information service plan.  App. at 129-35.  The City notes, and we agree, that implementation of these plans necessarily involves numerous state and local agencies.  The 1991 Consent Decree explicitly contemplates "the involvement of the Philadelphia judiciary, the office of the District Attorney, and the Defender Association."  App. at 113-14.

Of most relevance to this appeal, the City undertook to develop a plan for promulgating physical and operational standards consistent with "constitutional standards" and "correctional industry standards of the American Correctional Association."  See note 5 infra.  This plan contemplates a three-step process.  Paragraph C.1. of the Prison Planning Process requires the City to develop physical plant standards and general design guidelines for renovation and new construction capital projects.  App. at 131.[5]

---

[5]  Such standards "shall comply with constitutional standards and requirements for the incarceration of sentenced prisoners and pretrial detainees, where applicable, and shall comply with correctional industry standards of the American Correctional Association (ACA), with reference to those of the American Jail Association (AJA), the Federal Department of

Paragraph C.2. requires the City to

> [c]onduct an analysis of Philadelphia's existing jail
> and prison facilities using the physical plant
> standards and design guidelines developed pursuant to
> [Paragraph C.1.] . . . to determine how each existing
> facility might best be used, if at all, to house the
> projected daily prison population; and develop a plan,
> including implementation schedule, for necessary
> physical improvements to existing facilities.

App. at 131-32.  This required analysis has come to be known as

the "Facilities Audit."

Paragraph C.3. provides that the City shall "[d]evelop

a phased plan, including an implementation schedule, for the

development of such new correctional capacity as may be necessary

to house the projected prison population."  App. at 132.

Paragraph C.3. refers, in turn, to Paragraph A.2.b. which

obligates the City to develop and periodically update a ten-year

projection of the inmate population, taking into account the

expected effect of anticipated case management and processing

reforms.  App. at 128.  Hence, the third step in the process came

to be known as the "Ten-Year Plan."  See also Harris v. Reeves,

761 F. Supp. 382, 391 (E.D. Pa. 1991) (approving 1991 Consent

Decree and noting plans to develop and apply physical and

operational standards).

The 1991 Consent Decree provides that if a plan is not

submitted by its due date or if the plan which is submitted is

determined by agreement of the parties or by the court to fall
(..continued)
Justice (DOJ), the American Public Health Association (APHA), the
American Medical Association (AMA), and the American Bar
Association (ABA)."  App. at 131.

short of substantial compliance or to have been submitted in bad faith, defendants shall forfeit $500 per day for each day that no acceptable plan is submitted, increasing to $1000 per day after thirty days.  ¶ 22, App. at 121.  The City will also be subject to a penalty of $500 per day for the first thirty days and $1000 per day thereafter for each day of delay in complying with a plan "milestone."  ¶ 27, App. at 123.  All penalties "shall be used or distributed as determined by the Court on the advice of the parties and the Special Master."  ¶ 28, App. at 124.  The district court retained jurisdiction to enforce the provisions of the 1991 Consent Decree.  ¶ 33, App. at 125.[6]

---

[6]  The 1991 Consent Decree also provided mechanisms for resolution of disputes over plans.  After submission of each plan, the plaintiff class and all other affected entities have ten days to submit comments and objections to the Special Master. ¶ 20, App. at 120.  After all objections are submitted, the parties and other affected entities, with the assistance of the Special Master, are to attempt to resolve their differences through negotiation.  ¶ 21,  App. at 120-21.  If these differences cannot be resolved within 30 days after submission of all objections, the Special Master must submit the City's plan, all objections, and his own recommendation to the district court, which may then decide whether or not to approve the plan.  Either the plaintiff class or the City may request a hearing concerning the plan at issue within ten days, or any other affected entity may request a hearing upon a demonstration of "good cause." ¶ 21, App. at 120-21.

## FACTS LEADING TO THIS APPEAL

Under the 1991 Consent Decree the City was obligated to develop physical and operational standards for the prisons by September 6, 1991; prepare the Facilities Audit by December 6, 1991; and draft the Ten-Year Plan by July 31, 1992.  App. at 138. After the City had difficulty in meeting these dates, the parties negotiated revisions embodied in the January 1992 Stipulation and Agreement Amending Due Dates for Plans Comprising the Prison Planning Process (hereafter "Amended Stipulation") (entered by the court on January 7, 1992) to April 30, 1992,  August 31, 1992, and December 31, 1992 respectively.  Addenda to City's Brief at A-68 to A-69.  Paragraph 8 of the Amended Stipulation provides that the penalties described in the 1991 Consent Decree for late submission "are presently accruing" for those submissions that were late, id. at A-58, but Paragraph 11 established a procedure for modification of the revised deadlines.[7]  Apparently the City did not follow that procedure, and no revision of the dates in the Amended Stipulation was made.

In return for the revised dates agreed to in the Amended Stipulation, the parties also agreed to added teeth in the procedure for imposition of penalties.  If the City failed to

_____

[7]  That procedure required submission of a "Phase 1 Schedule" by December 20, 1991 and a "Phase 2 Schedule" by March 16, 1992, and provided that failure to submit these schedules made defendants subject to daily penalties.  Addenda to City's Brief at A-59 to A-60.

comply with the revised dates, the daily penalties from the 1991 Consent Decree "shall immediately accrue." ¶ 13, id. at A-61. Furthermore, the new procedure expressly authorized collection of daily penalties without court action.

        Paragraph 16 provides:

        16. Any daily penalty that accrues pursuant to this Stipulation and Agreement, including all accrued amounts, shall be paid into the Court . . . <u>without any further direction from the Court and without any application to the Court by the plaintiffs</u>. All penalties owed by the defendants and the City shall be paid into the Court within thirty (30) days following receipt of the plaintiffs' demand for such payment. Plaintiffs shall not make such demand with respect to any Plan unless and until notified by the Special Master that the Plan was not submitted by its Due Date in the Revised Schedule (subject to any modification of that date pursuant to paragraph 11 hereof).

Id. at A-62 (emphasis added).

Due dates could be extended by the Special Master "upon application by the [City] . . . supported by good cause, provided that the application is filed with the Special Master and served on the plaintiffs at least ten (10) days prior to the Due Date it seeks to extend." ¶ 17, id. at A-62 to A-63. "Good cause" was strictly defined to mean causes "not reasonably foreseeable" which are "entirely" beyond the City's control and without its fault or negligence.

In January 1992, a new mayor for the City of Philadelphia, Edward G. Rendell, was sworn into office. On January 7, 1992, as one of the first acts of the new administration, the City filed a Motion to Modify the December 30, 1986 Decree and the March 11, 1991 Decree. Specifically, the City moved for an order of the court pursuant to Federal Rule of

Civil Procedure 60(b)(4)-(6) to vacate the provisions of the consent decrees concerning population limits and the non-admission or release of pre-trial detainees. The City gave three grounds for the proposed modification: First, the consent decrees were ultra vires acts by the previous administration because the City was obliged under state law to follow state court incarceration orders and it lacked the power to bind future administrations in the administration of police power authority; Second, experience with the qualified admissions moratorium and the release mechanism demonstrated that it was no longer equitable to implement the decrees for reasons of public safety and the orderly administration of justice; Third, the Supreme Court's decision in Wilson v. Seiter, 501 U.S. 294 (1991), holding that an Eighth Amendment violation requires proof of "deliberate indifference" by prison administrators, constituted a change in law applicable to modification of consent decrees.

Notably, in the Motion to Modify the City re-committed itself to the Prison Planning Process, stating:

> This administration . . . recognizes that the prisoners and the public have legitimate interests in the enlargement and improvement of Philadelphia's prisons and in sound penological policies. In fact, consistent with the desire of this Court to expedite the construction of sound prisons, on December 11, 1991, then Mayor-elect Rendell wrote then Managing Director Pingree asking that the prison planning and construction schedule be speeded up. As Mayor, Mr. Rendell will direct the implementation of this request as urgent City policy.

App. at 223.

In September 1992, the district court set an evidentiary hearing for November 9, 1992 on the City's Motion to Modify, but by order of November 6, 1992 postponed the hearing until January 25, 1993 and required the City to submit proposed findings of fact and conclusions of law in support of that motion by November 30, 1992.  In compliance, the City submitted its proposed findings and conclusions, which relied in part on some of the data developed by its consultant, the Criminal Justice Institute, in connection with its preparation of the Facilities Audit and the Ten-Year Plan, even though those documents had yet to be submitted.[8]

At a regular status hearing on December 18, 1992, the court suggested that the City should comply with its obligations under the Prison Planning Process required by the 1991 Consent Decree before it would adjudicate the Motion to Modify, App. at 665-67, even though the City was willing to allow the plaintiff class to proceed with discovery of its experts in connection with the Motion to Modify.  App. at 667.  By order of January 11, 1993 the court, finding that "[t]he conduct of the City necessitates the postponement of the hearing on the Motion to Vacate until the conclusion of the process contemplated by the Consent Decree," expressly linked the scheduling of discovery and a hearing date

_____

[8]  Specifically, the proposed findings relied upon (1) a report entitled An Alternative-to-Incarceration Plan for Philadelphia: Findings and Proposed Strategies, November 1992, prepared by the Crime and Justice Research Institute and (2) material prepared by the Criminal Justice Institute.  Addenda to City's Brief at A-38.

on the Motion to Modify to the City's submission of the Facilities Audit.  See Supp. App. at 1571-72.  A rescheduled hearing was tentatively set for April 1993.

The City had submitted its proposed physical standards and design guidelines under subparagraph C.1. on August 14, 1992.[9]  App. at 773, 1276-77.  Plaintiffs responded with comments and objections to the standards, and the City submitted revised standards.  The parties then entered into some negotiations, App. at 773, 1276-77, and discussed their differences at several meetings with the Special Master, but apparently he never submitted the physical standards to the district court for approval.  App. at 1276-77.  Therefore, the district court still has neither approved or disapproved these standards.

Although neither the 1991 Consent Decree nor the Amended Stipulation relieved the City from its obligation to proceed with the Facilities Audit and the Ten-Year Plan, the City submitted neither document by the stipulated dates of August 31, 1992 and December 31, 1992.  This led to the extensive chronology of missed deadlines and broken promises set forth in the margin.[10]

---

[9]  Because the City had failed to submit the physical standards by April 30, 1992, as required by the Amended Stipulation, the district court, following a hearing, imposed $78,000 in penalties with the possibility for remission. Thereafter, the court refused the requested remission because the City had not requested an extension prior to the due date nor shown good cause for delay.  Supp. App. at 1141, 1557.  The City did not appeal from this imposition of penalties.

[10]  By way of letter of September 14, 1992, the plaintiffs reminded the City that it was required to pay stipulated daily

On October 5, 1993 the district court <u>sua sponte</u> found

that the City's conduct constituted "a pattern of contempt of the

Consent Decree which should not be permitted to continue."

Addenda to City's Brief at A-4. The court ordered that the City

pay $584,000 in fines due and owing, ordered submission of both

documents within ten days, and scheduled a hearing "to consider

(..continued)
penalties upon demand. Supp. App. at 1558. On December 18, 1992, at a status conference the City represented that both the Facilities Audit and the Ten-Year Plan could be ready by mid-February although counsel for the City noted, "[p]art of the problem is we can't do an audit until we have agreed upon physical standards." App. at 620-21. On December 21, 1992 the City requested an extension for submission of the Facilities Audit and the Ten-Year Plan. Supp. App. at 1565. It projected that the two documents would be completed by March or April 1993 but gave no firm date for submission. On March 24, 1993, the City sent a letter to plaintiffs and to the court projecting submission on or before June 1, 1993. Addenda to City's Brief at A-26. Then, on May 10 the City sent another letter advising submission would not be before the end of June. <u>Id.</u> at A-22. The court then rescheduled the hearing on the City's Motion to Modify to December 20, 1993. <u>Id.</u> at A-3. On June 9, 1993 the plaintiff submitted a demand for penalties for the City's tardiness. <u>Id.</u> at A-3. As of that date, the accrued stipulated penalties totaled $267,000 for 282 days of default in submitting the Facilities Audit and $145,000 for 160 days of default in submitting the Ten-Year Plan.

At the end of June the City sent yet another letter requesting a further extension of up to thirty days. <u>Id.</u> at A-21. On July 29, the City wrote that it hoped that the documents would be complete by the end of August. <u>Id.</u> at A-17. The Special Master wrote to the City on August 27, 1993 requesting an estimate when the documents would be submitted, but there was no reply from the City and no submission of the Facilities Audit or the Ten-Year Plan. On September 3, 1993 the plaintiffs demanded payment of stipulated penalties totalling $584,000 for the City's failure to submit the Facilities Audit and the Ten-Year Plan without receiving extensions of time for good cause. <u>Id.</u> at A-3 to A-4. The City ignored the demands for the stipulated penalties.

imposition of additional accrued fines and/or whatever other measures of coercive civil contempt necessary to obtain submission of the Facilities Audit and Ten-Year Plan, including but not limited to dismissal [of the City's] . . . Motion to Modify." See Addenda to City's Brief at A-5. In the order, the court noted that one of the named defendants, Commissioner J. Patrick Gallagher, Superintendent of the Philadelphia Prison System, had written a letter stating that there were 5,400 beds for 5,000 inmates, which appeared to be based on conclusions from the Facilities Audit that had not yet been submitted as required. Id. at A-4.

The City, which had still not made the required submissions, moved on October 15, 1993 for an extension until January 15, 1994. The court granted that motion as to the Ten-Year Plan but ordered the Facilities Audit to be submitted "forthwith in whatever form it presently exists, whether as a preliminary outline, draft, text subject to review, etc." Id. at A-16.

On October 29, 1993, the court held what all parties agree was a contempt hearing to determine further coercive civil contempt sanctions needed to obtain submission of the late material. See App. at 1206-1324. Prior to this hearing the plaintiff class had sought to obtain production of the Facilities Audit and the Ten-Year Plan by issuing a subpoena for the production of the documents. At the October 29 hearing the court considered arguments from the City why the subpoena should be quashed, why the City had been unable to comply with the

deadlines for submission of the Facilities Audit, and why it should not dismiss the Motion to Modify as a sanction for civil contempt.

In the course of that hearing, David L. Cohen, Mayor Rendell's Chief of Staff, testified that the City had completed the Audit by April 30, 1993 but that because it had decided to fully integrate the Facilities Audit with the Ten-Year Plan, it declined to produce the Facilities Audit on the ground that it contained materials that it considered to be subject to attorney-client privilege and the work product doctrine. App. at 1249-86. Plaintiffs' counsel introduced as evidence a transcript of the testimony of Commissioner Gallagher in the state court proceedings stating that the Facilities Audit was in existence. App. at 1229-33. The City objected, arguing that Commissioner Gallagher's statements were not on this record, and also argued that Commissioner Gallagher's letter as to the number of available beds, previously referred to by the court, "was erroneous [and] . . . in no way represents the policy of the City." App. at 1215-16. The City admitted that it had received an eight-volume report from its experts from which the Facilities Audit could be redacted. It stated that it was willing to submit the Facilities Audit without further review but had not yet done so because the October 5 order required production of both the Facilities Audit and the Ten-Year Plan which it was not yet prepared to produce. App. at 1244-46.

At the conclusion of the October 29 hearing, the court announced it would accept the Facilities Audit by November 8,

1993 but would sanction the City by dismissing the City's Motion to Modify. It so ordered on November 1, 1993 after finding the City to be in contempt for violating the 1991 Consent Decree, Paragraph 16 of the Amended Stipulation, and the October 5 order. See Addenda to City's Brief at A-32 to A-33. In dismissing the City's Motion to Modify, the court did not articulate whether this was a dismissal with or without prejudice or whether the City might petition for leave to refile once it had submitted the documents.

In a memorandum opinion of November 17, 1993 sur the November 1 order dismissing the Motion to Modify, the district court criticized the City's "deliberate strategy of selective compliance with the court's orders." Id. at A-36. It found the City's claim of ignorance and lack of funds to be patently pretextual and found there was clear and convincing evidence that the City had failed to comply with a valid court order. Id. at A-43 to A-44.

On November 8, 1993, the City finally submitted the Facilities Audit and on January 14, 1994 it submitted the Ten-Year Plan. App. at 77, 81.

The orders appealed in Nos. 93-1977 and 93-2117 are final decisions within the scope of 28 U.S.C. § 1291. See Inmates of Allegheny County Jail v. Wecht, 874 F.2d 147 (3d Cir.), vacated on other grounds, 493 U.S. 948 (1989), on remand 893 F.2d 33 (3d Cir. 1990); Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Engineers, 552 F.2d 498 (3d Cir.), cert. denied, 434 U.S. 822 (1977). The order appealed in

No. 93-2116 is an injunction over which we would have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## III.

### DISCUSSION

The imposition of contempt is reviewed under an abuse of discretion standard and will only be disturbed if there is an error of law or a clearly erroneous finding of fact.  United States v. Sarbello, 985 F.2d 716, 727 (3d Cir. 1993).  A finding of civil contempt must be supported by clear and convincing evidence.  Quinter v. Volkswagen of America, 676 F.2d 969, 974 (3d Cir. 1982).  We determine on a plenary basis whether the district court committed an error of law.  American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1146-49 (3d Cir. 1986).[11]  We review the sanction imposed for civil contempt for abuse of discretion.  See Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania, 678 F.2d 470, 478 (3d Cir.), cert. denied, 459 U.S. 969 (1982).  We also review the imposition of stipulated penalties under an abuse of discretion standard.  See Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 908 (3d Cir. 1991), cert. denied, 112 S. Ct. 1473 (1992).  The City does not contest the finding of fact that it was late with the submissions

---

[11]  The City's contention that our review of a finding of civil contempt is plenary is based on a misreading of American Greetings.  In American Greetings, there were two contempt orders on appeal.  One of the two was reversed because the preliminary injunction on which it was based was insufficiently specific, a legal issue.  We upheld the other contempt order which "clearly [fell] . . . within the scope of [the underlying] Consent Order" applying a much more limited review.  807 F.2d at 1148.

nor does it raise any legal question over the proper interpretation of the consent decree in these appeals. Thus, we review the orders at issue in these appeals for abuse of discretion.

The City makes essentially three arguments in its appeal of the imposition of monetary penalties and the dismissal of its Motion to Modify as a civil contempt sanction. First, it claims it was not afforded due process before being adjudicated in contempt and before imposition of civil contempt sanctions. Second, it contends it was unable to meet the deadlines because of unanticipated delays, and that inability to comply with a court order despite diligently attempting to do so is an absolute defense to contempt. Third, it contends the district court abused its discretion by imposing the "severe" and "punitive" contempt sanction of dismissing the City's Motion to Modify the Consent Decree, when less severe remedies were available to coerce compliance and the Motion was unrelated to the contumacious actions. We consider the City's arguments in the context of reviewing each order of the district court in turn.

**A.**

**<u>The October 5, 1993 Order</u>**

In the October 5, 1993 order, the district court recapitulated the relevant facts, the City's failure to make the submissions when due, and the various communications from the City delaying the dates when the submissions would be made. The district court stated that "[d]efendant's conduct appears to constitute a pattern of contempt of the Consent Decree which should not be permitted to continue." The court then ordered the City to pay into court the entire amount of the stipulated penalties (denominated by the court as "fines") due and owing at the time of plaintiffs' September 3, 1993 demand letter for failure to submit the Facilities Audit and Ten-Year Plan when due. The court also ordered defendants to submit the Facilities Audit and Ten-Year Plan within ten days and set a hearing to consider imposition of additional accrued fines or other measures of coercive civil contempt. Addenda to City's Brief at A-4 to A-5.

We believe that notwithstanding the district court's reference to contempt, we should not analyze the October 5, 1993 order as an order for civil contempt. There is no explicit finding of contempt, such as that contained in the Order of November 1, 1993, which expressly states, "[t]he defendants are found to be in contempt of the following court orders . . . ." The reference to the defendants' "pattern of contempt" in the October 5 order appears to be descriptive rather than a formal finding of contempt. Thus, although the November 1, 1993 order

clearly is one of civil contempt and must be analyzed as such, we view the October 5, 1993 order as the imposition of stipulated penalties.

As the City argues, due process does require notice and a hearing before a finding of contempt is made and before the imposition of contempt sanctions so that the parties "have an opportunity to explain the conduct deemed deficient . . . and that a record will be available to facilitate appellate review." Newton v. A.C. & S. Inc., 918 F.2d 1121, 1127 & n.5 (3d Cir. 1990). For an indirect contempt, such as failure to obey a court order, it is appropriate to give notice by an order to show cause and to hold a hearing. See Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 97 (3d Cir.), cert. denied, 454 U.S. 1092 (1981); see also Roe v. Operation Rescue, 920 F.2d 213, 217 (3d Cir. 1990) (due process before imposing civil contempt requires an "opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case").

However, the City did not object in the district court on constitutional grounds to the court's procedure in finding it had violated the Amended Stipulation without entering an order to show cause and without giving the City an opportunity to present evidence. As a general rule we will not consider objections that have not been raised in the district court. See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7 F.3d 1110, 1115 (3d Cir. 1993); In re American Biomaterials Corp., 954 F.2d 919, 927 (3d. Cir. 1992); Frank v. Colt Indus., Inc., 910 F.2d 90, 100 (3d Cir. 1990); Flick v. Borg-Warner Corp., 892 F.2d 285, 287 (3d Cir.

1989); Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d. Cir. 1976).  Moreover, this general rule "applies with added force where the timely raising of the issue would have permitted the parties to develop a factual record."  American Biomaterials, 954 F.2d at 927-28.

The City contends that it should be excused for failing to raise this objection because it had no opportunity to do so in light of the district court's sua sponte entry of the October 5 order.  Therefore, it argues, it is not barred from raising the due process issue for the first time in this court.

We need not consider whether the City has a valid excuse for failing to object in the district court or whether its failure to raise the issue in the district court precludes our consideration because, as we suggested earlier, we believe the order of October 5 directing payment of the stipulated penalties need not have been denominated a civil contempt order.[12]

> Paragraph 13 of the Amended Stipulation provides that
> If the defendants fail to comply with the Due Date in
> the Revised Schedule . . . then the daily penalties
> described in paragraph 7 hereof shall immediately
> accrue for that Plan . . . . Separate penalties shall
> accrue for each Plan that is not submitted by its Due
> Date in the Revised Schedule . . . .

Paragraph 16 continues:  "Any daily penalty that accrues pursuant to this Stipulation and Agreement, including all accrued amounts,

---

[12]  In light of our conclusion, we do not address the plaintiffs' argument that the City could have filed a motion under Fed.R.Civ.P. 60(b)(4) to relieve it of the order on the ground it was void for failure to accord it due process.

shall be paid into the Court . . . <u>without any further direction</u> <u>from the Court and without any application to the Court by the</u> <u>plaintiffs</u>." (emphasis added). Thus, the court's order of October 5 was, in effect, the imposition of liquidated or stipulated penalties, and the reference to contempt for that purpose was extraneous.

Consent decrees are interpreted under ordinary contract law principles. See <u>Fox v. United States Dep't of Hous. & Urban</u> <u>Dev.</u>, 680 F.2d 315, 319 (3d Cir. 1982) ("Although consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken."); <u>Halderman v. Pennhurst State Sch. and</u> <u>Hosp.</u>, 901 F.2d 311, 318–19 (3d Cir.) (treating Final Settlement Agreement as a contract), <u>cert. denied</u>, 498 U.S. 850 (1990); <u>Sansom Comm. v. Lynn</u>, 735 F.2d 1535, 1539 (3d Cir.) (same), <u>cert.</u> <u>denied</u>, 469 U.S. 1017 (1984). It follows that a consent decree may contain a provision for liquidated damages for breach of the decree in the same manner as a contract which sets the damages at an amount that is reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of the proof of the loss. See Restatement (Second) of Contracts § 356 (1981). Such a liquidated damages clause "saves the time of courts, juries, parties and witnesses and reduces the expense of litigation." <u>Id.</u> cmt. A.

In this case, the Amended Stipulation to the 1991 Consent Decree explicitly obliged the City to pay over the accrued fines to the plaintiff class without court intervention. The parties might have made some other arrangement but they chose

to agree to self-executing penalties.  In return for this automatic imposition of penalties, the City received, <u>inter alia</u>, an extended deadline for its voluntarily undertaken obligation to produce the Facilities Audit and Ten-Year Plan.  This was material upon which the entire Prison Planning Process was dependent.  In light of the plain language of the Amended Stipulation, we find completely unpersuasive the City's argument that its consent to the imposition of stipulated penalties did not waive its rights to notice and a hearing before those penalties could be imposed and collected.

The City argues that under the 1991 Consent Decree and the Amended Stipulation, the district court was required to find that there was no good cause for the City's delays in submission of the documents before the court could impose the penalties to which the City had agreed.  Under Paragraph 17 of the Amended Stipulation, "[a]ny Due Date for a Plan specified in the Revised Schedule . . . may be extended by the Special Master upon application by the defendant <u>supported by good cause</u>, provided that the application is filed with the Special Master and served on the plaintiffs at least ten (10) days prior to the Due Date it seeks to extend."  Addenda to City's Brief at A-62 to A-63 (emphasis added).  The Stipulation defines "good cause" as:

> Unavoidable delays in complying with a Plan Due Date caused solely by causes not reasonably foreseeable by the parties and which are entirely beyond the control and without the fault or negligence of the defendants or their agents or their independent contractors, . . . and shall include, without limitation, the following events:  Acts of God, acts of war, quarantine restrictions, general strikes throughout the relevant trades, freight embargoes not caused or participated in

> by defendants, fire, flood, epidemics, and weather of unusual severity.

Id.

The City contends that the district court should have held a hearing or hearings to determine whether the City's explanation of the delays constituted good cause. The City's argument is disingenuous. It never candidly faces up to the fact that under the Amended Stipulation allowance of one or more extensions for "good cause" is conditioned on the City's timely application. The City never made any such "good cause" application. Instead of making the required "application," the City announced its expected tardiness in a series of letters, some of which requested the court to extend the due dates, but none even purported to show "good cause" as defined. Moreover, the only formal motion the City made, the motion of October 15, 1993, was not timely, since it was filed thirteen months after the Facilities Audit was due and nine months after the Ten-Year Plan was due. The district court justifiably concluded that this pattern of conduct evinced a pattern of disregard and noncompliance with even the most elementary procedures to which the City had committed itself. By its own actions, the City forfeited its right to a good cause hearing before imposition of the stipulated penalties.

When the City did have the opportunity to state the reasons for its failure to timely produce the Facilities Audit and Ten-Year Plan, it attributed its failure to unanticipated delays and the difficulty of coordinating multiple agencies and

branches of governments to formulate the plans.  If the Order of October 5, 1993 were an adjudication of civil contempt, the City would have a valid defense were it able to show physical impossibility.  See Halderman v. Pennhurst State Sch. & Hosp., 673 F.2d 628, 638 (3d Cir. 1982) (in banc), cert. denied, 465 U.S. 1038 (1984); see also Newman v. Graddick, 740 F.2d 1513 (11th Cir. 1984).  There is general support for the proposition that a defendant may not be held in contempt as long as it took all reasonable steps to comply.  See, e.g., Securities and Exch. Comm'n. v. AMX, Int'l, Inc., 7 F.3d 71, 73 (5th Cir. 1993); New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1351 (2d Cir. 1989) (contempt may be found only if party did not diligently attempt to comply in reasonable manner), cert. denied, 495 U.S. 947 (1990); National Advertising Co. v. City of Orange, 861 F.2d 246, 250 (9th Cir. 1988).

However, the burden is that of the defendant to introduce evidence beyond "a mere assertion of inability," and to show that it has made "in good faith all reasonable efforts to comply."  See Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1301 (11th Cir. 1991) (citing United States v. Ryan, 402 U.S. 530, 534 (1971)); see also United States v. Millstone Enterprises, Inc., 864 F.2d 21, 24 (3d Cir. 1988).

One of the unanticipated delays to which the City refers is the failure of the district court to approve the physical plant standards and general design guidelines the City had previously submitted.  The City contends this delay interfered with its preparation of the Facilities Audit and Ten-

Year Plan, because the Facilities Audit was to be based on the physical standards.  At the outset, we note that had the district court issued a ruling on the proposed standards and design guidelines submitted by the City, it is likely that at least some of the subsequent delay would have been avoided.  Nonetheless, at oral argument the City conceded that it would have been possible for it to have prepared the Facilities Audit using the physical standards it proposed, and indeed ultimately it used the proposed standards even without court approval.  Argument Transcript at 42-43.

Although we recognize that proceeding on the basis of as-yet-unapproved physical standards may have subjected the City to additional cost if amendment to the Facilities Audit were required to accommodate standards the court subsequently adopted, the possibility of such a cost increase did not make the City's submission of the Facilities Audit "impossible."  Moreover, it is undisputed that the City had the opportunity to seek an extension of time from the district court on that basis, but did not do so.

In Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114 (3d Cir. 1979), cert. denied, 444 U.S. 1026 (1980), we upheld the district court's modification of a consent decree based on its finding that despite the City's good faith efforts, performance was impossible and circumstances were beyond the parties' contemplation and defendant's control.  See id. at 1120. In contrast, in this case the district court found that the City was not unable to comply with the 1991 Consent Decree and the Amended Stipulation.  That finding was not clearly erroneous.

At the hearing before the district court on October 29, 1993, the City sought to explain its failure to produce the Facilities Audit on the ground that it had planned to produce an integrated document with both the Facilities Audit and the Ten-Year Plan, and that it was not yet ready to produce the Ten-Year Plan. The district court rejected this explanation, noting that the "'decision' to complete the Audit and Ten-Year Plan simultaneously was made solely by the defendants, without the agreement of the plaintiff class or approval of the court." Addenda to City's Brief at A-47.

The court's finding is fully supported in the record. Although the City argues that it was not until it received the Order of October 28, 1993 directing it to submit the Facilities Order "forthwith" and the Ten-Year Plan at a later date that it understood that the district court would permit submission of the Facilities Audit separately, nothing in the language of the 1991 Consent Decree suggests that the two documents must be integrated. In fact, the agreement of the City to submit the two documents on two different and sequential dates shows that the City must have understood that the two documents were to be distinct. The Consent Decree did not preclude combination of the two documents, but it contains no provision that authorized late submission of the Facilities Audit if combined with the Ten-Year Plan. In any event, both were late.

A party may not rely on its unilateral interpretation of the requirements for compliance in complex institutional reform litigation as an excuse for noncompliance. See Pennhurst,

673 F.2d at 637-38 (criticizing government officials for resorting to self-help in interpretation of consent decree after enactment of restrictive legislation rather than seeking relief under Federal Rules of Civil Procedure 60(b)(5) or (6)). Thus we reject the City's attempt to excuse its noncompliance on the supposed link between the Facilities Audit and the Ten-Year Plan.

The district court rejected the City's proffered defense of inability to comply, noting that Mayoral Chief of Staff Cohen had admitted that drafts of the Facilities Audit and Ten-Year Plan were already available and under review and that the "reasons asserted [by the City] to justify [the motion for an extension] were factually in error." Addenda to City's Brief at A-41 to A-42. It found that the City's asserted claim of "ignorance of the requirements of the Consent Decree and efforts required to effect compliance for the first eight months of [the Rendell] . . . administration . . . belies the competence of counsel and the history of this case" in light of the numerous meetings between the Special Master, the parties and the court. Id. at A-43. It also found that the City's asserted claim of lack of funds was inaccurate, given the availability of funding from City bonds authorized for that purpose. Those findings are not clearly erroneous.

Nothing that the City has argued convinces us that it was in fact unable to comply with a schedule to which it had agreed and which had been revised at its request.[13] It has

---

[13] In Public Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C. Cir. 1987), on which the City relies, the court

pointed to nothing in the record that supports its claim of good cause for failure to comply, and certainly nothing that meets the strict definition of that term in the consent decree.

Based thereon, the imposition of stipulated penalties of $584,000 was not an abuse of discretion. We will therefore affirm the district court's order of October 5, 1993.

## B.

### The October 28, 1993 Order

The Order of October 28, 1993 granted the City's motion for an extension of time to submit the Ten-Year Plan but denied the motion for an extension of time to submit the Facilities Audit, and ordered its submission "forthwith." As noted in the previous section, the City submitted the Facilities Audit on November 8, 1993 and the Ten-Year Plan on January 14, 1994. Thus, we must consider whether this appeal is moot, which depends on whether there exists a "'subject matter upon which the judgment of the court can operate' to make a substantive determination on the merits." Jersey Cent. Power & Light Co. v. State of New Jersey, 772 F.2d 35, 39 (3d Cir. 1985) (quoting Ex Parte Baez, 177 U.S. 378, 390 (1900)).[14]

(..continued)
was reviewing an application for contempt brought against OSHA for its lengthy delays in setting standards. The court declined to hold OSHA in contempt but required that it adhere to dates it set out in its response to the contempt motion. OSHA, unlike the City in this case, had not signed a consent decree specifying dates certain for compliance. Thus that case is inapplicable here.

[14] The "availability of effective relief is one measure of the existence of a continuing controversy between parties with cognizable interests in the outcome" and "also may indicate the

The City responds that because the Order of October 28 "put [it] in the position, on October 29th, of having to stand in contempt for not having produced [the] audit," it is not moot. See Argument Transcript at 16-17. The City also implies that it may be subject to daily fines for violation of the October 28 order. Argument Transcript at 18. As a general principle, once a party has complied with a court order or injunction, and has not been penalized or suffered any prejudice that could be remedied on appeal, the appeal is moot. See generally 13A Charles A. Wright, et al., Federal Practice and Procedure § 3533.10 (1984). In the case of the October 28 Order, the district court imposed no fines and the City points to nothing in the record that suggests such an order is either imminent or forthcoming.

Although we agree that the Order of October 28 is implicated in the City's arguments in its appeal of the Order of November 1, 1993, those arguments, to the extent relevant, can be

(..continued)
presence of a continuing effect of the alleged misconduct on a complainant." International Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 915-16 (3d Cir. 1987). Accord Fauconniere Mfg. Corp. v. Secretary of Defense, 794 F.2d 350, 351-52 (8th Cir. 1986) (appeal of preliminary injunction enjoining performance of contract moot when stay pending appeal granted and contract completed); Gjertsen v. Board of Election Comm'rs, 751 F.2d 199, 201-02 (7th Cir. 1984) (appeal of grant of preliminary injunction of minimum signature requirements for primary ballots moot where primary held and defendants did not request election to be re-run); cf. Brill v. General Indus. Enter., 234 F.2d 465, 469 (3d Cir. 1956) (appeal of refusal to enjoin sale of corporation's assets moot because sale consummated and "where the act sought to be restrained has been performed, the appellate courts will deny review on the ground of mootness").

fully explored and analyzed in the context of that appeal. Therefore, we will dismiss No. 93-2116, the appeal from the Order of October 28, 1993, as moot.

## C.

### The November 1, 1993 Order

1. The Finding of Contempt

As noted earlier, the Order of November 1, 1993 expressly found the City in contempt, and based that finding on the City's failure to submit the Facilities Audit and Ten-Year Plan by the dates required by the 1991 Consent Decree and the Amended Stipulation, its failure to pay the stipulated penalties when they were demanded by plaintiffs' letters of June 9, 1993 and September 3, 1993 as required by paragraph 16 of the Amended Stipulation, and its failure to submit the Facilities Audit within ten days of the court's Order of October 5, 1993, as required therein.

The applicable principles have been set forth in our earlier cases. To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order. Roe v. Operation Rescue, 919 F.2d 857, 871 (3d Cir. 1990). The validity of the underlying order is not open to consideration. Inmates of Allegheny County Jail, 874 F.2d at 152 (citing Pennhurst, 673 F.2d at 636-37). The resolution of ambiguities ought to favor the party charged with contempt. United States on behalf of I.R.S. v. Norton, 717 F.2d 767, 774 (3d Cir. 1983). A contempt citation should not be granted if "there is ground to doubt the

wrongfulness of" the defendant's conduct.  Quinter, 676 F.2d at 974 (quotation omitted).

Most of the City's arguments challenging the finding of contempt go to its purported inability to comply.  Our rejection of those arguments in our consideration of the Order of October 5, 1993 is equally applicable here.  However, some of the City's additional arguments must also be considered.

The City contends that the district court erred as a matter of law when it ordered the production of preliminary unreviewed drafts of the Facilities Audit because this material was protected by the deliberative process privilege.  Most of the cases cited by the City do not arise under any possible common law deliberate process privilege but instead arise under Exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5), which has a specific exemption for "intra-agency memorandums."  See, e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975); State of Texas v. Interstate Commerce Comm'n, 889 F.2d 59, 60 (5th Cir. 1989); Lead Industries Ass'n v. OSHA, 610 F.2d 70, 80 (2d Cir. 1979).

Nonetheless, there may be some basis for the City's objection to the direction in the Order of October 28, 1993 to submit the Facilities Audit "in whatever form it presently exists, whether as a preliminary outline, draft, text subject to review, etc."  We need not address the appropriateness of such a direction because the district court did not find the City in contempt of the Order of October 28.  Instead, it was the City's failure to comply with the provision of the Order of October 5,

1993 directing it to submit the Facilities Audit within ten days that was one of the bases of the contempt Order of November 1, 1993. Because that order did not require the City to produce any internal documents, the City has no applicable privilege defense, even if such a defense could be raised at this stage.

In a somewhat related argument, the City asserts that because a newly-elected Mayor may set new policies, the election of Mayor Rendell who took office at the beginning of 1992 entitled it to a grace period to redo the Facilities Audit and the Ten-Year Plan. The City concedes, as it must, that the election of a new administration does not relieve it of valid obligations assumed by previous administrations. Just as the City would not have been free to break its contract with a vendor or other contractor because of the election of a new administration, so too changes in administrative policy alone do not permit the City to unilaterally default on its obligations to the court and other litigants.

Moreover, in the case on which the City relies for its "grace period" argument, Evans v. City of Chicago, 10 F.3d 474 (7th Cir. 1993) (in banc), cert. denied, 114 S. Ct. 1831 (1994), the city defendants had brought a Fed.R.Civ.P. 60(b)(5) motion seeking relief from a consent judgment on the ground, as set forth in that rule, that "it is no longer equitable that the judgment should have prospective application." The City has never argued, here or in the district court, that it was no longer equitable that it should produce a Facilities Audit and Ten-Year Plan, documents upon which the Prison Planning Process

hinged. The cases are therefore not comparable. We see no reason to reverse the finding of contempt contained in the November 1, 1993 order, because the record shows by clear and convincing evidence that the City failed to comply with the provisions of the prior orders cited.[15]

We turn therefore to the sanction imposed by the district court for the contempt, i.e. dismissal of the Motion to Modify. It is to this sanction that the City directs its most vigorous argument and which the amici addressed in their briefs.

2. Dismissal of Motion to Modify as Contempt Sanction

In contrast to its failure to invoke Rule 60(b) as a basis for extricating itself from the deadlines for filing the Facilities Audit and the Ten-Year Plan, the City did use Rule 60(b)(4)-(6) as the basis for its January 1992 Motion to Modify certain provisions of the 1986 Consent Decree and the 1991 Consent Decree. As set forth in the facts supra, this motion was filed by the new City administration seeking to extricate itself from the provisions establishing a maximum allowable prison population, requiring the non-admission of detainees, and requiring the release of detainees. The district court postponed the hearing date on several occasions, and finally dismissed the

---

[15] The City also argues that the district court penalized it for appealing the Order of October 5, 1993 imposing the stipulated penalties by basing the contempt finding in the Order of November 1, 1993 in part on the City's failure to pay the stipulated penalties in response to the plaintiffs' demand letters. We need not address this argument because the City's failure to abide by the other two orders listed is clear. This argument may be addressed on remand should the appropriate sanction be considered once again.

Motion to Modify "as a sanction for . . . contempt."  In its

explanatory opinion of November 17, l993, the district court

stated that the Motion to Modify "is dependent upon the very

documents the City has failed to submit," that the City

defendants "have refused and continue to refuse to pay the

penalties provided for by the Consent Decree and ordered by this

court, so there is no reason to believe monetary penalties would

be an appropriate sanction," and that "[d]ismissal of the Motion

to Modify is necessary to punish the City's defiance and prevent

prejudice to the plaintiff class."  Addenda to City's Brief at A

–50 (emphasis added).

　　　The City contends that the court's dismissal of

the Motion to Modify was an inappropriate sanction for a

civil contempt order.  The City's argument finds support

in the Supreme Court's recent decision of International Union,

United Mine Workers v. Bagwell, 114 S. Ct. 2552 (1994), where the

Court reiterated the distinction between sanctions for civil and

criminal contempt.  In that case, the Court identified two

purposes for civil contempt: one coercive and the other

compensatory.  Id. at 2558 (citing United States v. United Mine

Workers, 330 U.S. 258, 303–04 (1947)).[16]  The Court cited as the

---

[16]  With respect to the "compensatory" purpose of civil
contempt, the Bagwell Court reaffirmed the "longstanding
authority" of judges "to enter broad compensatory awards for all
contempts through civil proceedings." Bagwell, 114 S. Ct. at
2563; see also Roe, 919 F.2d at 868 ("The purpose of civil
contempt is primarily remedial and is to benefit the
complainant.") (citing Hicks v. Feiock, 485 U.S. 624, 631 (1988)

paradigmatic civil contempt order one that allows the contemnor to purge the contempt by committing an affirmative act and who thus, as it were, "'carries the keys of his prison in his own pocket.'" Bagwell, 114 S. Ct. at 2558 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 442 (1911)); see also Penfield Co. v. SEC, 330 U.S. 585, 590 (1947).

In holding that coercive sanctions must be capable of being purged to be civil and to be within the court's inherent authority, Bagwell, 114 S. Ct. at 2557 (observing that civil fines like coercive imprisonment "exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged"), the Court reiterated a long-standing requirement of civil contempt. See Penfield, 330 U.S. at 590 (citing In re Nevitt, 117 F. 448, 461 (8th Cir. 1902)); see also United Mine Workers, 330 U.S. at 304-05 (fixed fines may be considered capable of being purged when imposed and suspended pending future compliance); Shillitani v. United States, 384 U.S. 364, 370-71 (1966) (civil contempt is imposed for remedial purpose if court conditions release from imprisonment upon contemnor's willingness to testify).

(..continued)
and Latrobe Steel Co. v. United Steelworkers, 545 F.2d 1336, 1343 (3d Cir. 1976)). Even when the sanctions coerce, they aid the complainant by ensuring that the contemnor adheres to the court's order. See Roe, 919 F.2d at 868; see also Bagwell, 114 S. Ct. at 2557.

To the extent that "a sanction operates whether or not a party remains in violation of the court order, it obviously does not coerce any compliance."  In re Magwood, 785 F.2d 1077, 1082 (D.C. Cir. 1986); 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 2960, at 585 (1973).  If the contemnor cannot purge through an affirmative act, the sanction has no coercive effect and exceeds the appropriate bounds of civil contempt.

The Court explained that because "civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience," they may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard, and require neither a jury trial nor proof beyond a reasonable doubt. Bagwell, 114 S. Ct. at 2557.  Criminal contempt sanctions, by way of contrast, are punitive and vindicate the authority of the court by punishing past acts of disobedience.  See id. at 2557–58; see also Hicks, 485 U.S. at 631; Shillitani, 384 U.S. at 368–70 & n.5); United Mine Workers, 330 U.S. at 302; Roe, 919 F.2d at 868.  In such cases, a jury is required.

The Court in Bagwell was presented with the question of the appropriateness of contempt fines of $52 million for widespread and ongoing violations of a labor injunction, payable to the general fisc.  In reversing the state court judgment, the Court held the fines were criminal in nature because petitioners

had no opportunity to purge the fines once they were imposed. See Bagwell, 114 S. Ct. at 2562. Therefore, sanction was improper because it had been imposed without the procedural protections that accompany a finding of criminal contempt, including foremost a jury trial.

Whether a contempt is "civil" or "criminal" depends upon the "'character and purpose' of the sanction involved." Id. at 2557 (quoting Gompers, 221 U.S. at 441). With these general principles to inform us, we examine the City's challenge to the appropriateness of the district court's dismissal of the City's Motion to Modify as an inappropriate sanction for civil contempt. Patently, that sanction was not compensatory. Nor was it designed to have a coercive effect impelling the City to submit at long last the tardy Facilities Audit and Ten-Year Plan, because it had no provision explicitly permitting the City to refile the motion once the documents were submitted. Although it is arguable that because the Order did not specify that the dismissal was with prejudice the City may have refiled the motion after it complied with the submission of the documents, and thus we should regard it as a coercive civil contempt order, that argument is belied by the district court's own language. It stated that "the dismissal of the Motion to Modify is based upon a finding of contempt," and that it was dismissing the motion "to punish the City[ ]." We see no reason not to take the court at its own words.

We could not sustain the dismissal of the Motion to Modify as a sanction for criminal contempt, because it is evident that the requisite procedural protections, in particular a jury trial, were not accorded.  Like the fines at issue in Bagwell, the conduct cannot be termed to be petty contempt, which like other petty criminal offenses may be tried without a jury.  114 S. Ct. at 2562 n.5.  "Under such circumstances, disinterested factfinding and even-handed adjudication were essential, and petitioners were entitled to a criminal jury trial."  Id. at 2562.  Thus, although we see no reason to relieve the City of the court's finding that it was in contempt, we cannot uphold the court's imposition of the dismissal of the Motion to Modify as a sanction for that civil contempt.

3.  Dismissal of Motion to Modify as a Discovery Sanction

Fed. R. Civ. P. 37(b)(2) authorizes a district court either in lieu of or in addition to one of the listed sanctions, including striking pleadings, to enter an order treating as contempt of court the failure of the party to obey any court order.[17]  In Bagwell, the Court also recognized that "[c]ourts

_____

[17] The original Notes of the Advisory committee to the 1937 Adoption of Rule 37 state:

> The provisions of this rule authorizing orders establishing facts or excluding evidence or striking pleadings, or authorizing judgments of dismissal or default, for refusal to answer questions or permit inspection or otherwise make discovery, are in accord with Hammond Packing Co. v. Arkansas, 1909, 29 S.Ct. 370, 212 U.S. 322, 53 L.Ed. 530, 15 Ann.Cas. 645, which

traditionally have broad authority through means <u>other than</u>

<u>contempt</u> -- <u>such as by striking pleadings</u>, assessing costs,

excluding evidence, and entering default judgment -- to penalize

a party's failure to comply with the rules of conduct  governing

the litigation process."  114 S. Ct. at 2560 (emphasis added).

In entering its order dismissing the Motion to Modify,

the district court also stated it was informed by the standard

stemming from <u>Poulis v. State Farm Fire & Casualty Co.</u>, 747 F.2d

863 (3d Cir. 1984), for dismissing an entire case as sanction.[18]

(..continued)

> distinguishes between the justifiable use of
> such measures as a means of compelling the
> production of evidence, and their
> unjustifiable use, as in <u>Hovey v. Elliott,</u>
> 1897, 17 S.Ct. 841, 167 U.S. 409, 42 L.Ed.
> 215, for the mere purpose of punishing for
> contempt.

Fed. R. Civ. P. 37 advisory committee's note (1937).

[18]  In <u>Poulis</u> we identified six factors to consider in levying the sanction of dismissal of an action for failure to obey discovery schedules, failure to prosecute, or to comply with other procedural rules: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and to respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.  747 F.2d at 868.  The <u>Poulis</u> court emphasized that dismissals with prejudice or defaults are drastic sanctions, termed "extreme" by the Supreme Court, <u>see</u> <u>National Hockey League v. Metropolitan Hockey Club, Inc.</u>, 427 U.S. 639, 643 (1975), and are to be reserved for cases comparable to the "flagrant bad faith" and "callous disregard" exhibited in

It is therefore incumbent upon us to consider whether dismissal of the Motion to Modify was within the district court's discretion as a sanction for failure to comply with discovery.

We have affirmed dismissal of an action as a sanction for extreme abuses of discovery or other procedural rules or for failure to prosecute. See, e.g., Hoxworth v. Blinder Robinson & Co., Inc., 980 F.2d 912 (3d Cir. 1992) (default judgment under Rule 55 for failure to defend suit); Mindek v. Rigatti, 964 F.2d 1369, 1373-75 (3d Cir. 1992) (dismissal appropriate under Rules 16, 37 and 41(b) for persistent failure to file a pretrial statement); Curtis T. Bedwell & Sons, Inc. v. International Fidelity Ins. Co., 843 F.2d 683, 691-96 (3d Cir. 1988) (dismissal as a Rule 37 sanction for failing to comply with discovery orders over extended period); Marshall v. Sielaff, 492 F.2d 917, 918 (3d Cir. 1974) (dismissal for failure to prosecute under Rule 41(b) and inherent power of the court).

The City argues that implicit in Poulis is the requirement that there be a relationship between the party's default and the pleading being dismissed. Such a requirement was referred to in Insurance Corp. of Ireland v. Compagnie Des Bauxites, 456 U.S. 694 (1982). Although the Court held that the district court in that case had not abused its discretion in treating personal jurisdiction over defendants as established,

(..continued)
National Hockey League. See National Hockey League, 427 U.S. at 643.

absent proof to the contrary, because the defendants had failed

repeatedly to comply with discovery orders on that issue, the

Court stated that a district court's broad discretion to impose

discovery sanctions pursuant to Rule 37(b)(2) is limited by two

standards:

> First, any sanction must be "just"; second, the
> sanction must be specifically related to the
> particular "claim" which was at issue in the
> order to provide discovery.

Id. at 707 (emphasis added).  The Court noted that the latter

requirement embodies the due process limits that it had held

seven decades earlier apply to striking pleadings for failure to

comply with a discovery order.  Id. (citing Hammond Packing Co.

v. Arkansas, 212 U.S. 322, 350-51 (1909)).[19]

We have also recently employed the "related"

requirement in evaluating sanctions imposed pursuant to Tax Court

Rule 104(c).  See Estate of Spear v. Comm'r of Internal Revenue,

41 F.3d 103, 109-10 (3d Cir. 1994).  Even more important, in

Inmates of the Allegheny County Jail v. Wecht, 754 F.2d 120 (3d

Cir. 1985), another case in which the local government

persistently failed to comply with maximum population limits for

---

[19]  In an older case, Hovey v. Elliott, 167 U.S. 409 (1897),
the Court held that an answer to a complaint may not be struck as
a sanction for contempt.  In its most recent discussion of this
case in Insurance Corp., the Court reconciled the discovery
sanctions permissible under the Federal Rules of Civil Procedure
with the due process requirement of Hovey, stating that when Rule
37(b)(2) is properly applied, it is consistent with due process.
Insurance Corp., 456 U.S. at 706.

inmates at a county jail, we overturned the court's imposition of a sanction of $5,000 for each prisoner who had to be released to comply with that maximum, because, inter alia, "[t]here is no discernable connection between the sanction and any of the remedial features of the injunction in place." Id. at 129. We held that the direction to pay $5,000 per released inmate "lacked a sufficiently specific nexus with the underlying violations and their correction so as to amount to an abuse of discretion." Id. at 130.

Thus, absent the type of flagrant discovery violation that we have held supports dismissal of an entire suit or imposition of default judgment, we agree with the City that some nexus must be found between the district court's dismissal of the Motion to Modify and the City's failure to timely submit the Facilities Audit and the Ten-Year Plan.

In order to establish such a nexus in this case, the district court found that "the Motion to Modify is dependent upon the very documents the City has failed to submit," Addenda to City's Brief at A-50, and that the pendency of the motion "has permitted the City to rationalize its noncompliance with certain aspects of the Consent Decree on the hopeful assumption that a modification was possible and forthcoming." Id. at A-52. We find the purported relationship tenuous. The Motion to Modify did not seek to relieve the City of the obligation to undertake the Prison Planning Process which was the plan to which the

Facilities Audit and the Ten-Year Plan were directed. Thus it is difficult to see how noncompliance with the deadlines could have relieved the City of its obligations under the Prison Planning Process.

Nor are we convinced that there were no other available sanctions more specifically related to the Motion to Modify. The district court could have continued to delay the hearing on the Motion to Modify until submission of the documents, which would have obviated any advantage to the City from its delay in submitting the documents and would have relieved the prejudice to plaintiffs, if any, referred to by the district court if they had been required to proceed with the hearing on the Motion to Modify without access to the information relied upon by the City in its proposed findings of fact. The court also could have precluded the City from relying upon the information prepared by the City's consultants in the draft Audit as the basis for its proposed findings in support of the Motion to Modify. Finally, the court could have continued to assess the stipulated monetary penalty for each day of noncompliance. Although the court believed that that sanction was not effective because the City had failed to pay in light of its appeal of the October 5 Order, that penalty continued to accumulate and accrue.

Thus, we conclude that because of the absence of a more decided nexus between the delay in submission of the documents and the Motion to Modify, we cannot affirm dismissal of the

Motion to Modify as a sanction for the City's delay and will thus reverse that portion of the Order of November 1, 1993 and remand that issue to the district court. In doing so, we note that throughout our review of the extensive record in these and the related appeals, we have been impressed with the dedication and perseverance of the district judge notwithstanding the City's repeated evasion of responsibilities that it voluntarily fashioned and undertook more than eight years ago. The district judge's frustration with the City's repeated failure to submit the two documents when promised was justifiable.

It is precisely because of the long period of time this matter has proceeded and the important interests that are at stake that the the district court may wish to consider the merits of the Motion to Modify the Consent Decrees. We have been instructed that decrees of this sort are "not intended to operate in perpetuity." Board of Educ. v. Dowell, 498 U.S. 237, 248 (1991). In Rufo v. Inmates of Suffolk County Jail, 112 S. Ct. 748 (1992), the Court stated that because consent decrees in institutional reform litigation often remain in place for extended periods of time, "the likelihood of significant changes occurring during the life of the decree is increased." Id. at 758 (citing with approval Philadelphia Welfare Rights Org., 602 F.2d at 1119-21).

In this case, the brief filed by the United States as amicus curiae on appeal makes arguments that we believe merit

consideration.  It states, for example, not only that the United States believes "that a local jurisdiction subject to a consent decree governing its prison system has a duty, enforceable by appropriate means including contempt sanctions, to respect the terms of that decree," but also that "if the local jurisdiction makes a sufficient showing that the decree is having an unforeseen, adverse impact on law enforcement and public safety, the court that entered the decree has a duty to consider appropriate modifications."  Brief of United States at 3.  The United States notes that the City's Motion to Modify alleges that the decrees are having an unforeseen, adverse impact on law enforcement and public safety.  We agree that these are issues of public importance that deserve consideration by the district court.

The City's Motion also would have offered the district court an opportunity to assess its role in supervising the methods used by the City to comply with its obligation to reduce overcrowding in the Philadelphia prison system.  See Milliken v. Bradley, 433 U.S. 267, 282 (1977) (referring to "inherent limitation upon federal judicial authority" in fashioning decrees designed to correct constitutional violations).

Finally, we note that had the district court considered the merits of the Motion to Modify, some of the issues which have arisen as a result of the parties' differing interpretations as to the release mechanism which is the subject of our opinion in

Harris VII, being filed contemporaneously with this opinion, could have been avoided.

We offer no comment on the merits of the Motion to Modify but merely note that, in light of the passage of time and the possibility of relevant changes, a reexamination does not seem inappropriate. Although the district court stated in its November 17 Memorandum Opinion that it was not sure that the City could "prove changed circumstances," we do not regard that as the court's final determination on the merits of the Motion to Modify. Our prior ruling that the meritoriousness of the claim, one of the Poulis factors, "must be evaluated on the basis of the facial validity of the pleadings, and not on summary judgment standards" in considering dismissal as a sanction, Scarborough v. Eubanks, 747 F.2d 871, 875 (3d Cir. 1984), seems equally applicable here.

We do not suggest that upon remand the district court is obliged to hold an immediate hearing. Indeed, on the state of this record the purpose of such a hearing is unclear, in light of the pendency before the district court of a more recent Motion to Modify filed by the City. In response to our inquiry as to whether the court's consideration of the later Motion makes moot our consideration of this part of the appeal, all parties assured us that it does not. We have no reason to hold otherwise, particularly in light of the possibility that the dismissal of

the Motion to Modify, should it remain intact, might influence subsequent proceedings.

For these reasons, we will reverse the portion of the Order of November 1, l993 dismissing the Motion to Modify as a sanction and remand for further proceedings.  We do not preclude the district court from imposing a different appropriate sanction.

## IV.

## CONCLUSION

To recapitulate in No. 93-1997, we will affirm the order of the district court of October 5, 1993 assessing $584,000 in stipulated penalties against the City of Philadelphia, and do not reach the question as to any additional penalties that may have accrued to this time.  We will dismiss as moot the appeal in No. 93-2116, from the order of October 28, 1993 directing production of the Facilities Audit.  Finally, in No. 93-2117 we will affirm so much of the order of November 1, 1993 as declared the City in contempt but will reverse that portion of the order that dismissed the City's Motion to Modify as a sanction.  We

will remand for such further proceedings as are consistent with this opinion.

_____