**APPLE CORPS LIMITED, MPL Communications, Inc., Yoko Ono Lennon As Executrix of the Estate of John Lennon, Subafilms, Ltd. and Yoko Ono Lennon, Plaintiffs,**

v.

**INTERNATIONAL COLLECTORS SOCIETY, John E. Van Emden, Scott L. Tilson, Jeffrey B. Franz and Howard E. Friedman, Defendants.**

Civ. No. 96–1571(JAG).

United States District Court,
D. New Jersey.

June 26, 1998.

Paul V. LiCalsi, Amy J. Lippman, Gold, Farrell & Marks, New York, NY, Robert P. Shapiro, Shapiro & Croland, Hackensack, NJ, for Plaintiffs.

Donald A. Robinson, Robinson, Lapidus & Livelli, Newark, NJ, Bradford J. Badke, Lindal L. Scott, Dewey Ballantine, LLP, New York, NY, for Defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion for civil contempt of Gold, Farrell & Marks, counsel for plaintiffs Apple Corps Limited, MPL Communications, Inc., Yoko Ono Lennon, as executrix of the estate of John Lennon, Subafilms, Ltd. and Yoko Ono Lennon (collectively "Plaintiffs"). The other motions before the Court are the cross-motion to dissolve the Consent Order and the motion for sanctions of Dewey Ballantine, LLP, counsel for defendants International Collectors Society, John E. Van Emden, Scott L. Tilson, Jeffrey B. Franz and Howard E. Friedman (collectively "Defendants"). These motions arise from the Defendants' alleged breach of a Consent Order that the parties entered into in June 1997. The Consent Order permitted the sale of certain licensed collectors' stamps that bore the images of The Beatles. The Court heard testimony and argument on these various motions over several sessions concluding in April 1998. Based on the arguments presented and the written submissions given to the Court, Plaintiffs' motion seeking civil contempt is granted and Defendants' motion seeking to dissolve the Consent Order and requesting that the Court levy sanctions is denied.

### PRELIMINARY STATEMENT

Plaintiffs commenced the above-captioned action against Defendants in April 1996. Plaintiffs alleged that Defendants were unlawfully trading off the good will associated with the legendary rock-n-roll band, The Beatles. Specifically, Plaintiffs alleged that Defendants created, marketed and sold, without any authorization from Plaintiffs, postage stamps featuring images of The Beatles, trademarks and copyrighted photographs (the "Stamps") owned and controlled exclusively by Plaintiffs. In addition to money damages, Plaintiffs sought a permanent injunction enjoining Defendants' exploitation of the Stamps.

In October 1996, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction barring Defendants from selling any Stamps bearing the likeness of The Beatles and/or Yoko Ono Lennon. In defense of the motion, Defendants' counsel, Bradford Badke, represented to the Court that Defendants would cease marketing any new Stamps bearing the image of Yoko Ono

Lennon or The Beatles. On November 6, 1996, the Court denied Plaintiffs' motion for a temporary restraining order and scheduled a preliminary injunction hearing for December 20, 1996. On November 8, 1996, Plaintiffs presented evidence to the Court that Defendants had continued selling such Stamps and requested that the Court reconsider its denial of a temporary restraining order. On November 14, 1996, the parties entered into a Consent Order which *inter alia,* preliminarily enjoined Defendants from marketing or distributing Stamps or any other product bearing the image of Yoko Ono Lennon or The Beatles.

In June 1997, the parties agreed to resolve the case by a Consent Order which the Court entered on June 19, 1997. On or about September 24, 1997, Plaintiffs brought a motion for contempt seeking to enforce paragraph O of the Consent Order. Paragraph O of the Consent Order provides:

> In the event that defendants or any of them breaches any provision of paragraphs A–I or K–L of this Order and as a result of such breach, plaintiffs or any one of them initiates legal proceedings to enforce their rights under this Order, defendants and each of them hereby: (1) agree that plaintiffs will be irreparably harmed by such breach and entitled to injunctive relief to prevent defendants from selling any further Stamps ... and (3) agree to reimburse plaintiffs for all their costs, including reasonable attorney's fees incurred in connection with any successful action or proceeding brought by plaintiffs (or any one of them) to enforce their rights under this Order.

(Consent Order ¶ O). Accordingly, Plaintiffs seek: (1) an order adjudging Defendants in civil contempt for violating the Consent Order; (2) a permanent injunction barring Defendants from selling any stamps featuring the name and/or likeness of The Beatles (collectively, or individually); and (3) attorneys' fees and costs incurred in connection with enforcing their rights under the Consent Order.

Defendants subsequently filed a cross-motion to rescind the Consent Order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure due to Plaintiffs' alleged breach of the Consent Order. Defendants also filed a separate motion seeking to impose sanctions on Plaintiffs' counsel on the grounds that counsel behaved unethically in procuring the stamps which form the basis of their contempt motion.

This Court heard four days of testimony and argument in connection with all three motions on November 3, 1997, November 24, 1997, January 13, 1998 and April 7, 1998.

*FACTS* [1]

### A. *The Parties*

Pursuant to agreements with former members of The Beatles, Plaintiff Apple Corps Limited ("Apple") is the sole and exclusive owner of rights in and to the name and likeness of The Beatles. Plaintiff MPL Communications, Inc. ("MPL") is the exclusive owner of rights in and to the name and likeness of Paul McCartney. Plaintiff Yoko Ono Lennon, as Executrix of the Estate of John Lennon, is the exclusive owner of rights in and to the name and likeness of John Lennon and the "John Lennon" registered trademarks. Plaintiff Subafilms, Ltd. ("Subafilms") is the copyright owner in and to the full-length animated film "Yellow Submarine" and the images contained therein. Plaintiff Yoko Ono Lennon ("Mrs.Lennon") is the exclusive owner of rights in her own name and likeness.

Defendant International Collectors Society ("ICS") is a Maryland corporation engaged in the direct marketing and sale of products, including postage stamps duly and legally issued by the governments of foreign countries, throughout the United States. Defendant John Van Emden is the President of ICS. Defendants Scott L. Tilson and Jeffrey B. Franz are co-founders and officers of ICS.[2]

---

1. Unless otherwise indicated, the following facts are undisputed.

2. Plaintiffs alleged in the Complaint that Howard E. Friedman is the principal of ICS. (*See* Complaint ¶ 9). Defendants denied this in their Answer to the Complaint. However, in the Answer,

## B. *The Consent Order and the Lennon License*

Subject to certain exceptions, the June 1997 Consent Order permanently enjoins Defendants from distributing or selling "postage stamps or any other product ... bearing or referring to (i) the name and/or likeness of The Beatles, John Lennon ... (vi) the John Lennon registered trademark of the John Lennon signature ..." (Consent Order ¶ A(i) and (vi)).

One of the exceptions to the Consent Order's permanent injunction provides that Defendants may continue to sell Stamps featuring John Lennon's name, trademark or image pursuant to a written license agreement from the Lennon Estate (the "Lennon License"). (Consent Order ¶ D). The Lennon License requires that prior to distribution, Defendants submit for approval any "promotional material which incorporates Licensor's Trademarks ... which is intended to be used in conjunction with the sale or distribution of" Lennon Stamps. (Lennon License ¶ 3(a)(i)). The Lennon Estate may not unreasonably withhold approval of promotional material; however, material not approved within seven days of Licensor's receipt is deemed disapproved. *Id.* Exhibit A to the Lennon License provides that "Lennon and John Lennon are trademarks of the Estate of John Lennon."

Another exception to the Consent Order's permanent injunction allows Defendants to sell (i) up to 2,000 of each of the Stamps listed in Exhibit E to the Consent Order for a period commencing February 28, 1997 and ending February 28, 1998; and (ii) the Stamps listed in Exhibit F to the Consent Order for a period commencing February 28, 1997 and ending February 28, 1999 (collectively the "Sell–Off Stamps").[3] (Consent Order ¶ E(i)). However, Defendants may sell the Sell–Off Stamps "only to persons who, according to [Defendants'] records, are members of the Beatles/Lennon Club by reason of

purchase of stamps other than the Sell–Off Stamps ..." *Id.*

The Beatles/Lennon Club is comprised of people who: (1) have previously purchased a Beatles or John Lennon stamp from Defendants; and (2) are currently enrolled in Defendants' "new issue service." The "new issue service" is a service that periodically ships new stamps to a customer on a "keep or return basis." When a person purchases a Beatles or John Lennon stamp, Defendants assign that person a VIP number. If that person joins the new issue service, Defendants enroll that person in the Beatles/Lennon Club and sends a letter welcoming her to the club.

## C. ICS

ICS uses more than seventy toll-free telephone numbers for marketing to new customers and three toll-free telephone numbers for marketing to existing customers. ICS provided a club membership toll-free telephone number (1–800–606–3490) exclusively to persons who were enrolled in one of ICS's clubs[4] dedicated to a celebrity or famous person. Club members received that number with their membership package. This telephone number is not printed on any other material or advertised to the general public.

## D. *The Fact Booklets*

Defendants publish and distribute booklets containing information about certain celebrities with the sale of certain stamps. These are known as "99 facts booklets." At issue are two versions of these 99 facts booklets: one entitled "99 Little Known Facts About John Lennon and Groucho Marx" (the "Lennon/Marx Fact Book") and one entitled "99 Little Known Facts About John Lennon" (the "Lennon Fact Book"). Defendants included the Lennon Fact Book free with each shipment of Lennon Stamps, and the Lennon/Marx Fact Book free with each shipment of a stamp depicting both John Lennon and Groucho Marx (the "Lennon/Marx Stamp").

counsel for Dewey Ballantine entered an appearance for Mr. Friedman.

**3.** The Sell–Off Stamps are designated in the Consent Order by code—e.g., JLM, LB8, LB9, MTB, GFB and TB9.

**4.** In addition to the Beatles/Lennon Club, ICS has other clubs dedicated to other celebrities.

Customers were entitled to keep the free booklets even if they returned the Stamps.

During the course of negotiating the Lennon License, Defendants' counsel submitted to Dorothy Weber, counsel for the Lennon Estate, an ICS advertisement for the Lennon/Marx Stamp for the Lennon Estate's approval. The advertisement referred to a "99 facts booklet." Since Ms. Weber had never seen the booklet referred to in the advertisement, on May 2, 1997, she advised Defendants' counsel that Defendants must submit this booklet for review and approval. However, as of May 30, 1997, when the parties executed the Lennon License, Defendants had not yet sent Ms. Weber a copy of the Lennon Fact Book or the Lennon/Marx Fact Book.

On or about August 1, 1997, Mrs. Lennon provided Ms. Weber with a copy of the Lennon Fact Book. Mrs. Lennon had received it from a fan named Lisa Adams. Ms. Adams was upset about certain statements in the Lennon Fact Book which she believed were false. Ms. Weber telephoned Defendants' attorney, Bradford J. Badke. She told him that a fan had sent the booklet to Mrs. Lennon, and that Mrs. Lennon was very upset about information contained in the Lennon Fact Book. Ms. Weber advised Mr. Badke that she had never seen the Lennon Fact Book nor had she approved it for distribution. Ms. Weber pointed to two of the statements in the Lennon Fact Book which were particularly offensive: one which implied Mrs. Lennon had experienced a miscarriage as a result of physical abuse by John Lennon, and another which stated that John Lennon and Mrs. Lennon were both heroin addicts.

Following their conversation, Ms. Weber wrote to Mr. Badke requesting that he immediately provide copies of any and all advertising and promotional materials as provided for in paragraph 3 of the License Agreement. Mr. Badke replied that "ICS inadvertently continued" to distribute the booklet "after the execution of the license agreement on the mistaken belief that the booklet had been approved." (Weber Aff., Ex. 5, Letter from Badke to Weber of 8/1/97). Mr. Badke added that "ICS [will] immediately cease sending the booklet to customers." *Id.* He also wrote that "[c]onsistent with your earlier letter of today, ICS will send to you copies of all advertising and promotional material relating to the licensed stamps." [5] *Id.*

A few days later, ICS's president, John Van Emden, sent Ms. Weber a package of materials along with a cover letter, which referred to the material he was sending as "packaging and promotional material related to [ICS's] sales of Lennon stamps for your review and approval." (Weber Aff., Ex. 6, Letter from Van Emden to Weber of 8/5/97). Mr. Van Emden's letter referenced the enclosed Lennon Fact Book and the New Issue Alert.[6] Mr. Van Emden reiterated Mr. Badke's prior statement that the Lennon Fact Book "is NOT being used now pending your review." *Id.*

Mr. Van Emden did not include the Lennon/Marx Fact Book in his package. At the time Ms. Weber was not aware that there were two versions of the 99 facts booklets so she did not realize that Mr. Van Emden had not submitted the Lennon/Marx Fact Book for approval.

### E. *Investigation Into Defendants' Compliance With the Consent Order* [7]

Ms. Weber never replied to Mr. Van Emden's letter regarding the materials which

---

**5.** The Lennon License provides that a breach of paragraph 3, requiring written approval for all promotional material, is non-curable and grounds for immediate termination. (Lennon License ¶ 13(b)). Although Defendants had distributed the Lennon Fact Book after the execution of the Lennon License and Consent Order, Ms. Weber did not take any steps at that time to terminate the License on behalf of the Lennon Estate based on Mr. Badke's assurances that distribution of the Lennon Fact Book had ceased.

**6.** "New Issue Alerts" are letters which accompany monthly mailings of stamps to Beatles/Lennon Club members. The New Issue Alerts inform customers that the next shipment of stamps is enclosed and they have the option of keeping or returning the stamps.

**7.** The Court obtained the facts concerning Plaintiffs' investigation into Defendants' compliance with the Consent Order from the testimony and affidavits of the relevant witnesses.

were submitted for approval. The New Issue Alerts, which Mr. Van Emden included in the package of promotional materials submitted for approval, referred to two different prices for Sell–Off Stamps: one for Beatles/Lennon Club members and one for nonmembers even though the Consent Order prohibited the sale of Sell–Off Stamps to nonmembers. On August 11, 1997, prior to the running of the seven day period for the Lennon Estate to approve the materials, Ms. Weber telephoned an ICS "800" number. The ICS sales representative took her order for Sell–Off Stamps even though she was not a member of ICS's Beatles/Lennon Club and had never before purchased stamps from ICS.

That same day Ms. Weber instructed her secretary, Lisa Ann Ruggeri, to call ICS. Ms. Weber wanted to determine whether her secretary could purchase Sell–Off Stamps despite the fact that she was not a member of any ICS club. Ms. Weber also asked Ms. Ruggeri to ask Joshua Glick[8] to call ICS to see if he could purchase Sell–Off Stamps from ICS even though he was not a member of any ICS club. Subsequently, Plaintiffs' counsel, Gold, Farrell & Marks, hired private investigators, the James Mintz Group, to telephone ICS to determine whether, as nonmembers, they could purchase Sell–Off Stamps.

### 1. Sale of Sell–Off Stamps to Dorothy Weber

On August 11, 1997, Ms. Weber dialed the telephone number (1–800–606–3490) which appeared on a New Issue Alert and posed as a consumer. She used her married name, Dorothy Meltzer, and referred the sales representative to the New Issue Alert designated "JL5." Ms. Weber stated that she wished to order certain stamps for her husband who was a John Lennon fan who had seen the stamps. When the sales representative advised Ms. Weber of the price, Ms. Weber questioned why it was higher than the price listed in the New Issue Alert. The sales

representative replied that club members received a lower price.

Ms. Weber received her order from ICS which included two different Sell–Off Stamps—LB19 and TB9. (See Weber Aff. ¶ 10 and Ex. 9; LiCalsi Aff. ¶ 11 and Ex. F). ICS charged her the higher, non-member price.

### 2. Sale of Sell–Off Stamps to Lisa Ann Ruggeri

On August 11, 1997, Ms. Ruggeri called ICS, on behalf of Plaintiffs, to determine whether she could order Sell–Off Stamps. She dialed the telephone number listed on the New Issue Alerts that Ms. Weber had shown her. Ms. Ruggeri was not a member of the Beatles/Lennon Club, and had never purchased stamps from Defendants before that time.

In placing her order, Ms. Ruggeri stated that she had seen certain Beatles stamps that a friend had, that she had been given a copy of a New Issue Alert from her friend and that she now wished to purchase two specific stamps referenced in the New Issue Alert. The ICS sales representative then suggested that Ms. Ruggeri order two additional Sell–Off Stamps (about which Ms. Ruggeri had not asked). The sales representative asked Ms. Ruggeri if she was a Beatles/Lennon Club member. Ms. Ruggeri advised the sales representative that she was not. The sales representative told her that since she was not a club member she could not get the stamps at the member's price.

Ms. Ruggeri received her order from ICS which included three different Sell–Off Stamps—LB8, LB9 and LB24. (See Ruggeri Aff. ¶ 7 and Ex.; LiCalsi Aff. ¶ 11 and Exs. E and F). ICS charged her the higher, non-member price.

### 3. Sale of Sell–Off Stamps to Joshua Glick

In August 1997, Joshua Glick called ICS, on behalf of Plaintiffs, to determine whether he could order Sell–Off Stamps. Mr. Glick

---

**8.** Joshua Glick is the stepson of Peter Shukat, Ms. Weber's partner and counsel for the Lennon Estate.

called the club telephone number which appeared on a New Issue Alert and requested specific stamps. He was not a member of ICS's Beatles/Lennon Club, and had never purchased stamps from ICS before that time. When placing his order, the sales representative asked Mr. Glick if he was a Beatles/Lennon Club member, and he answered that he was not. Mr. Glick purchased Sell–Off Stamps and subsequently received his order which included three different Sell–Off Stamps—LB15, MTB and GFB. (*See* Glick Aff. ¶ 4 and Ex.; LiCalsi Aff. ¶ 11 and Exs. E and F). ICS charged him the higher, non-member price for his stamps.

### 4. Sale of Sell–Off Stamps to Jeffrey Mitnick

On August 28, 1997, Amy Lippman, an associate at Gold, Farrell & Marks, counsel for Plaintiffs, called her husband Jeffrey Mitnick, Esq. and asked him to call ICS and order Beatles stamps. Mr. Mitnick obtained ICS's number (1–800–624–4427) from directory assistance. Mr. Mitnick was not a member of ICS's Beatles/Lennon club, and had never purchased stamps from ICS before that time.

When placing his order, Mr. Mitnick did not specify any particular stamp to the sales representative. He just said that he wished to purchase Beatles stamps. The sales representative suggested that Mr. Mitnick purchase a Sell–Off Stamp as part of a package of three stamps. Mr. Mitnick subsequently received his order which included the Sell–Off Stamp designated in the Consent Order as JLM. (*See* Mitnick Aff. ¶ 5 and Ex.; LiCalsi Aff. ¶ 11 and Ex. F). ICS charged him the higher, non-member price for his stamps.

### 5. Sale of Sell–Off Stamps to Thea Bournazian

In September 1997, Thea Bournazian, a private investigator with the James Mintz Group, called ICS, on behalf of Plaintiffs, to determine whether she could order Sell–Off Stamps. In consultation with Plaintiffs' counsel, the James Mintz Group prepared a script which provided investigators with a description of the specific stamps they should order. The script provided ICS's general

telephone number (1–800–235–1000). When Ms. Bournazian called that number, the sales representative told her that she had reached the number for Princess Diana stamps. Ms. Bournazian told the representative that she was a Beatles fan seeking to buy Beatles stamps. The sales representative put her on hold and returned with another telephone number for Ms. Bournazian to try (1–800–340–3666).

Ms. Bournazian called that number and advised the sales representative that she wished to purchase two specific Sell–Off Stamps. The sales representative indicated that those two stamps were no longer available. Ms. Bournazian then stated that she was a Beatles fan, and asked the sales representative if she "was sure" that she could not get them. After placing Ms. Bournazian on hold momentarily, the ICS sales representative returned to the line and took her order. Ms. Bournazian sent that telephone number (1–800–340–3666) to the other James Mintz investigators via electronic mail.

Ms. Bournazian subsequently received her order from ICS which included two different Sell–Off Stamps—LB24 and JL30. (*See* Bournazian Aff. ¶ 4 and Ex.; LiCalsi Aff. ¶ 11 and Ex. F). ICS charged her the higher, non-member price for her Stamps. Ms. Bournazian was not a member of the Beatles/Lennon Club, and had never purchased stamps from ICS before that time.

### 6. Sale of Sell–Off Stamps to Anne Murray

In September 1997, Anne Murray, a private investigator with the James Mintz Group, called ICS, on behalf of Plaintiffs, to see whether she could order Sell–Off Stamps. She used the number Ms. Bournazian had sent her.

In placing her order, Ms. Murray initially inquired whether ICS had a particular stamp which featured John Lennon and Paul McCartney playing guitars. This stamp is not a Sell–Off Stamp. The sales representative advised Ms. Murray that this stamp was not available. The representative then suggested that Ms. Murray order a particular set of John Lennon stamps which she pro-

ceeded to describe. This was a set which included Sell–Off Stamp "JLM". The ICS representative did not ask Ms. Murray if she was a member of the Beatles/Lennon Club. Ms. Murray did not place an order during that phone call, but called again later that day and asked to speak with the same sales representative she had spoken to earlier. The sales representative took her order.

Ms. Murray subsequently received her order which included the Sell–Off Stamp designated as "JLM" in the Consent Order. (See Murray Aff. ¶ 4 and Ex.; LiCalsi Aff. ¶ 11 and Ex. F). Ms. Murray was not a member of ICS's Beatles/Lennon Club, and had never purchased stamps from ICS before that time. ICS charged her the higher, non-member price for her stamps.

### 7. Offer of Sell–Off Stamps to Lolita Homer

On September 15, 1997, Lolita Homer, a researcher with the James Mintz Group, called the ICS, on behalf of Plaintiffs, to determine whether she could order Sell–Off Stamps. She used the telephone number Ms. Bournazian had sent to the James Mintz investigators. Ms. Homer was not a member of the Beatles/Lennon Club, and had never purchased stamps from ICS.

Ms. Homer inquired as to the availability of a particular stamp and the ICS sales representative told her that it was not available. The ICS sales representative then offered her several Beatles stamps including the Sell–Off Stamp labeled TB9. The ICS sales representative never asked Ms. Homer if she was a member of the Beatles/Lennon Club.

Ms. Homer declined to order that Sell–Off Stamp because she was not sure that Plaintiffs wanted that stamp. She did, however, call ICS back the following day to order the TB9 Sell–Off Stamp, but the sales representative who answered told her that it was sold out.

### 8. Unsuccessful Attempts to Obtain Sell–Off Stamps

Two other investigators with the James Mintz group, Nancy Reckler and Douglas Chrisholm, called ICS attempting to purchase Sell–Off Stamps. Ms. Reckler requested the Lennon/Marx Stamp but the sales representative told her that ICS no longer handled that stamp. Mr. Chrisholm called ICS twice. The first time he dialed the wrong number. The second time he called, he reached ICS and requested Sell–Off Stamp TB9. However, the sales representative told him that ICS no longer had Beatles stamps and would not be receiving any more.

### 9. Total Sales of Sell–Off Stamps

At least six different sales representatives answered the calls made by Plaintiffs' investigators. These sales representatives sold ten different kinds of Sell–Off Stamps to Plaintiffs' investigators even though none of them were club members.

### F. Mrs. Lennon's Termination of the Lennon License

Two of the people who called ICS, on behalf of Plaintiffs, Mr. Mitnick and Ms. Murray, received the Lennon/Marx Fact Book along with their order of Stamps. ICS never submitted the Lennon/Marx Fact Book to Ms. Weber for Mrs. Lennon's review and approval. The Lennon/Marx Fact Book contains 50 facts which are virtually identical to facts found in the Lennon Fact Book to which Mrs. Lennon had previously objected, and which Mr. Badke and Mr. Van Emden each indicated in separate letters that ICS had ceased distributing.

After receiving evidence that ICS was distributing the Lennon/Marx Fact Book, Ms. Weber sent a termination letter to Defendants which stated in relevant part:

As you are aware, on August 1, 1997, we determined that you were disseminating John Lennon materials which had not been approved. Notwithstanding that such conduct is a breach not subject to cure (see paragraph 13(b)), we gave you an opportunity to cure based on written representation by your counsel on August 1, 1997 and your written representation on August 5, 1997 that all distribution of the offending material had ceased. Despite such assurance, you have continued to violate the

express provisions of paragraph "3" by distribution of materials not approved.

This letter shall serve as notice that the Agreement is hereby terminated, effective immediately and that you have no continuing right to sell off inventory.

(Letter from Weber to ICS of 9/24/97).

### G. *ICS's Purchase of Stamps from IGPC*

Paragraph 1(f) of the Lennon License provides that Defendants have the right to purchase stamps from International Governmental Philatelic Corporation ("IGPC"), the Lennon Estate's prior Licensee. Paragraph 1(f) further provides that Defendants may distribute and sell the IGPC stamps in accordance with the terms and conditions of the Lennon License as long as Defendants comply with all the terms and conditions of the License.

On or about August 5, 1997, Defendants purchased stamps from IGPC for resale and distribution at a purchase price of $78,000. Pursuant to paragraph 1(f) of the Lennon License, Defendants' resale of these stamps would be subject to all of the terms of the License, including its royalty provisions. (*See* Lennon License ¶ 1(f)). The royalty structure set forth in the Lennon License provides that Defendants would pay the Lennon Estate a royalty of 15% of Defendants' purchase cost of the stamps or 10% of its profits from the sale of the stamps, whichever is greater. (Lennon License ¶ 6(a)). The License further provides that at signing, Defendants must pay the Lennon Estate a minimum of $55,000 ($40,000 of which is recoupable against royalties). *Id.* ¶ 6(b). Thus, the smallest royalty Defendants would owe the Lennon Estate from its purchase of stamps from IGPC would be 15% of $78,000, or $11,700, with such royalty being recoupable against Defendants' minimum guarantee of $40,000. *Id.* ¶ 6(b)(ii).

About a week or two after ICS paid the Lennon Estate the $55,000, one of the lawyers for the Lennon Estate, Peter Shukat, informed Defendant Tilson that Defendants and IGPC must pay the Lennon Estate an additional $30,000 in order to purchase stamps from IGPC pursuant to paragraph 1(f) of the Lennon License. Defendant Tilson advised Mr. Shukat in various telephone conversations that such payment was contrary to the terms of the Lennon License. Defendant Tilson and Mr. Shukat had a series of very tense telephone conversations in June and July concerning the IGPC payment in which Mr. Shukat made it clear that he did not wish to do business with Defendants.

Mr. Shukat and Defendant Tilson discussed the IGPC payment over a period of two months. The agreement they ultimately reached provided that in lieu of the royalty structure provided for in the Lennon License, ICS would make a one-time payment of $7,500. This one-time payment would not be recoupable against the minimum guarantee of $40,000. In order to benefit from this arrangement, ICS would have to sell enough stamps (other than IGPC stamps) to satisfy its minimum royalty of $40,000 in the first year. However, subject to ICS's risk of not recouping its minimum guarantee against sales of other stamps, ICS would save at least $4,200 ($11,700 minus $7,500) on royalties payable to the Lennon Estate for purchase of the stamps from IGPC.

IGPC paid the Lennon Estate $13,000 in connection with the sale of the IGPC Stamps.

### *DISCUSSION*

### I. PLAINTIFFS' MOTION FOR CONTEMPT

#### A. *Contempt*

A party is liable for civil contempt where (1) a valid court order existed, (2) defendant had knowledge of the order, and (3) defendant disobeyed the order. *Harris v. City of Philadelphia,* 47 F.3d 1311, 1326 (3d Cir.1995); *Roe v. Operation Rescue,* 54 F.3d 133 (3d Cir.1995). In this Circuit "absent extraordinary reasons, such as fraud or impossibility" failure to obey a court judgment constitutes contempt. *Harley–Davidson, Inc. v. Morris,* 19 F.3d 142, 146 (3d Cir.1994). "Willfulness is not a necessary element of civil contempt" and "good faith is not a defense to civil contempt." *Robin Woods Inc. v. Woods,* 28 F.3d 396, 398 (3d Cir.1994); *see also Harley–Davidson,* 19 F.3d at 148 (evi-

dence of good faith does not bar conclusion that defendant acted in contempt of consent judgment); *CBS Inc. v. Pennsylvania Record Outlet, Inc.*, 598 F.Supp. 1549, 1557 (W.D.Pa.1984) ("behavior may be construed as contemptuous even in the absence of wilfulness") (citing *McComb v. Jacksonville Paper Company*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949)).

■ Civil contempt is a "severe remedy." *Nelson Tool & Mach. Co. v. Wonderland Originals, Ltd.*, 491 F.Supp. 268 (E.D.Pa. 1980) (quoting *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 5 S.Ct. 618, 28 L.Ed. 1106 (1885)). The petitioner in a civil contempt proceeding must prove a violation of the Court's order by "clear and convincing evidence." *Robin Woods*, 28 F.3d at 399 (citations omitted); *Harley–Davidson*, 19 F.3d at 146. "[W]here there is ground to doubt the wrongfulness of the conduct," a court will not adjudge a party in contempt. *Robin Woods*, 28 F.3d at 399 (citations omitted).

### B. *Violation of Paragraph A of the Consent Order*

■ Plaintiffs allege that Defendants violated Paragraph A of the Consent Order by distributing the Lennon Fact Book and the Lennon/Marx Fact Book. The Court agrees.

Paragraph A of the Consent Order prohibits "distributing ... postage stamps or any other product ... bearing or referring to: (i) the name and/or likeness of ... John Lennon ..." Both booklets feature John Lennon's name and likeness on the front page.

Defendants argue that the fact booklets are not "products" under the Consent Order. Defendants contend that the plain and ordinary meaning of the word "products" within the context of the Consent Order is merchandise that is sold such as stamps or coins. Defendants assert that since the Lennon Fact Book and the Lennon/Marx Fact Book are included free with each shipment of the Lennon or Lennon/Marx Stamps, they are not "products". This argument is without merit.

Paragraph A of the Consent Order prohibits Defendants from "distributing, selling or otherwise disposing of or exploiting in any manner, postage stamps or any other product, including, but not limited to, coins, bearing or referring to: (i) the name and/or likeness of ... John Lennon ..." The express language of Paragraph A is unequivocal; the term "products" does not pertain only to items that are sold. Paragraph A prohibits "distributing, selling or otherwise disposing of ..." Furthermore, Paragraph A clearly refers to products other than stamps or coins. It prohibits distributing "postage stamps or any other product, including, but not limited to, coins ..."

The Consent Order does not define the term "products"; therefore, the Court must look to the plain meaning of the term. The dictionary defines "product" as "something produced". *Merriam–Webster's Collegiate Dictionary* 930 (10th ed.1996). Therefore, the fact booklets are clearly "products."

The Court entered the Consent Order on June 19, 1997. Mrs. Lennon received the Lennon Fact Book sometime after the parties executed the Consent Order. Defendants' attorney admitted that Defendants continued distributing the Lennon Fact Book after the execution of the Lennon License and the Consent Order, albeit inadvertently. (Letter from Badke to Weber of 8/1/97). Two of Plaintiffs' investigators, Mr. Mitnick and Ms. Murray, received the Lennon/Marx Fact Book on September 2 and 16, 1997, respectively, with their orders of the Lennon/Marx Stamp. It is evident that Defendants continued distributing both fact booklets after they entered into the Consent Order and after they told Ms. Weber that they were not distributing the fact booklets pending review and approval from the Lennon Estate. Since the Lennon Estate did not approve the fact booklets within seven days of receipt, they were deemed disapproved. (See Lennon License ¶ 3(a)(i)). Accordingly, Defendants violated Paragraph A of the Consent Order.

### C. *Violation of Paragraph B of the Consent Order*

Plaintiffs asserted for the first time in their Proposed Findings of Fact and Conclu-

sions of Law violations of Paragraph B of the Consent Order. Since Plaintiffs did not provide Defendants with proper notice of these claims, the Court will dismiss these assertions.

### D. Violation of Paragraph D of the Consent Order

■ Plaintiffs claim that Defendants violated Paragraph D of the Consent Order by distributing the Lennon Fact Book and the Lennon/Marx Fact Book without approval from the Lennon Estate.[9] The Court agrees.

Paragraph D of the Consent Order provides that Defendants may continue to sell Lennon Stamps only "in accordance with the express terms" of the Lennon License. The Lennon License requires that Defendants submit for approval "promotional material which incorporates Licensor's Trademarks ... which is intended to be used in conjunction with the sale or distribution of" Lennon Stamps. (Lennon License ¶ 3(a)(i)).

#### (a) Promotional Material

■ Defendants contend that the Lennon Fact Book and the Lennon/Marx Fact Book do not constitute promotional material and hence they were not required to obtain approval before distributing them. In support of their argument, Defendants note that customers received the booklets as a gift without being aware of the gift when they placed their order for stamps.

The term "promotional" is not defined in the Consent Order or the Lennon License so the Court will look to the dictionary for guidance.[10] The dictionary de-

fines "promotional" as "the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting." *Merriam–Webster's Collegiate Dictionary* 933 (10th ed.1996).

Defendants distributed the booklets free with the purchase of Lennon stamps as an incentive to increase sales of stamps and to induce customers to continue purchasing stamps from them in the future. Therefore, the fact booklets are promotional material.[11]

#### (b) Licensor's Trademarks

Exhibit A to the Lennon License provides that "Lennon and John Lennon are trademarks of the Lennon Estate." However, Defendants assert that the Lennon Fact Book and the Lennon/Marx Fact Book do not incorporate Licensor's Trademarks.

■ Defendants argue that the use of the phrase in Exhibit A "Lennon and John Lennon are trademarks of the Lennon Estate" is not the definition of "Licensor's Trademarks." Defendants claim that the term "Licensor's Trademarks" refers to the registered trademark of the stylized John Lennon signature referred to in the Consent Order. The Court finds Defendants' argument unpersuasive.

The Lennon License does not reference any other definition of "trademarks" other than the attached Exhibit A. It does not reference the Consent Order. The Lennon License refers to more than one trademark; it specifically reads "Licensor's Trademarks."

---

**9.** Plaintiffs also claim that Defendants violated Paragraph D of the Consent Order by distributing the New Issue Alerts and form solicitation letters for the Beatles/Lennon Club without approval from the Lennon Estate. However, Plaintiffs failed to assert these allegations in their moving papers and only raised them for the first time in their Proposed Findings of Fact and Conclusions of Law. Accordingly, the Court will dismiss these assertions because Plaintiffs did not provide Defendants with proper notice of these claims.

**10.** Defendants do not contend that "promotional" is a term of art. In fact, they refer to the Court to the dictionary for the definition of "promotional".

**11.** In their letter to Ms. Weber, Defendants refer to the Lennon Fact Book and other enclosed materials as "packaging and promotional material" submitted for approval. (Letter from Van Emden to Weber of 8/5/97). However, Defendants assert that Mr. Van Emden's letter is not a concession that the Lennon Fact Book and the Lennon/Marx Fact Book are promotional material. Defendants assert that in response to Ms. Weber's request for all materials, Mr. Van Emden sent her all the written material ICS possessed relating to Lennon without first determining which materials had to be approved by the Lennon Estate pursuant to the Lennon License. (*See* Jan. 13, 1998 Tr. at 13:9–14:13).

Exhibit A refers to the plural form.[12] In light of the language of Exhibit A and the use of the plural form in the Lennon License, the Court finds that "Licensor's Trademarks" includes the names "Lennon" and "John Lennon" as incorporated on the first page of the Lennon Fact Book and the Lennon/Marx Fact Book.

Consequently, Defendants' distribution of the Lennon Fact Book and the Lennon/Marx Fact Book, without approval from the Lennon Estate, violated paragraph 3 of the Lennon License and by extension, paragraph D of the Consent Order.

### E. *Violation of Paragraph E of the Consent Order*

■ Plaintiffs allege that Defendants violated Paragraph E of the Consent Order by selling Sell–Off Stamps to Plaintiffs' investigators even though they were not Beatles/Lennon Club members.

Paragraph E of the Consent Order provides that Defendants may not sell the Sell–Off Stamps to anyone other than members of the ICS Beatles/Lennon Club. ICS has computerized records of all Beatles/Lennon Club members and of each purchase made by that customer. Every time a customer calls, the sales representative must look up that customer's record. Thus, each of the sales representatives who took Plaintiffs' investigators' orders knew or should have known that none of the investigators were Beatles/Lennon Club members, as none of them had any record of membership or prior purchase. Additionally, at least half of Plaintiffs' investigators specifically advised the sales representatives that they were not Beatles/Lennon Club members. Furthermore, the ICS representatives charged all of Plaintiffs' investigators the higher, non-member price because they were not Beatles/Lennon Club members.

#### Substantial Compliance

Defendants assert as a defense that they have substantially complied with the terms of Paragraph E and the rest of the Consent Order. The Third Circuit has found that

"[t]here is general support for the proposition that a defendant may not be held in contempt as long as it took all reasonable steps to comply." *Harris*, 47 F.3d at 1324 (citations omitted). "If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." *Robin Woods, Inc.*, 28 F.3d at 400 (quoting *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986)).

■ Defendants have testified that they took reasonable steps to ensure that only Beatles/Lennon Club members could purchase Sell–Off Stamps. Defendants claim that they: (1) instructed their sales representatives to sell the Sell–Off Stamps only to Beatles/Lennon Club members; (2) ceased advertising or promoting the Sell–Off Stamps; (3) removed all promotional literature depicting the Sell–Off Stamps from the sales representatives; and (4) made the Sell–Off Stamps available for sale only through the in-house club telephone line. (Van Emden Aff. ¶¶ 5–11, 18–23; Flowers Aff. ¶¶ 3–4). However, some sales representatives must have had literature about the Sell–Off Stamps because three different sales representatives suggested specific Sell–Off Stamps to three of Plaintiff's investigators—Mr. Mitnick, Ms. Murray and Ms. Homer. *See supra* pp. 463–464. Furthermore, Mr. Mitnick did not call the club telephone line. He obtained ICS's telephone number from directory assistance. The James Mintz investigators dialed the number an ICS telemarketer gave Ms. Bournazian. It is evident that Plaintiffs' investigators were able to order Sell–Off Stamps even though they did not have the in-house club telephone number.

Even if this Court were to find that Defendants substantially complied with Paragraph E of the Consent Order, it would nevertheless have to enforce the remedies Defendants stipulated to in Paragraph O of the Consent Order. "Consent decrees are interpreted under ordinary contract law principles." *Harris*, 47 F.3d at 1323 (citing *Fox v. United States Dep't. of Hous. & Urban Dev.*, 680

---

12. At the bottom of the Lennon Fact Book, Defendants included the statement: "Lennon and John Lennon are trademarks of the Estate of John Lennon."

F.2d 315, 319 (3d Cir.1982)) ("Although consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken"); *see also Harley–Davidson*, 19 F.3d at 148 (consent judgment is to be interpreted as a contract, to which the governing rules of contract interpretation apply). "The agreement memorializes the bargained for positions of the parties and should be strictly construed to preserve those bargained for positions." *Halderman v. Pennhurst State School & Hosp.*, 901 F.2d 311, 319 (3d Cir.1990).

Paragraph O of the Consent Order provides that breach of "any provision" of paragraphs A through I or K through L entitles Plaintiffs to an injunction barring Defendants from selling any further stamps. Whether Defendants substantially complied is not relevant because the plain language of the Consent Order dictates the remedies in the event that Defendants violate "any provision". Here, Plaintiffs bargained for language which specifically avoids the necessity of an inquiry into the degree of neglect or willfulness involved, and affords them clear remedies based solely on breach (intentional or negligent) of "any provision" of specified paragraphs of the Consent Order. The Court must "strictly construe" the Consent Order to preserve those "bargained for positions." *Halderman*, 901 F.2d at 318; *see also Harris*, 47 F.3d at 1323 (enforcing plain language of consent decree providing for the imposition of stipulated penalties).

In addition to the consideration of Paragraph O, the evidence is such that this Court cannot logically conclude that Defendants substantially complied with the Consent Order. The violation of Paragraph E is beyond serious dispute.

### F. *Sanctions*

Defendants have violated Paragraphs A, D and E of the Consent Order. Paragraph O of the Consent Order entitles Plaintiffs to an injunction barring Defendants from selling any further stamps; therefore, the Court must and shall enforce this remedy.

Paragraph O of the Consent Order also provides that Defendants "agree to reimburse plaintiffs for all their costs, including reasonable attorneys' fees incurred in connection with any successful action or proceeding brought by plaintiffs to enforce their rights under this Order." Based on the plain language of Paragraph O, the Court must award costs, including reasonable attorneys' fees, to Plaintiffs.

### II. DEFENDANTS' MOTION TO DISSOLVE THE CONSENT ORDER

Defendants seek to dissolve the Consent Order, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. Defendants claim that the Lennon Estate breached the Lennon License and the implied covenant of good faith and fair dealing by; (1) extorting money from Defendants in connection with the IGPC Stamps; (2) withholding approval of the Lennon Fact Book, the Lennon/Marx Fact Book and the New Issue Alerts; (3) terminating the Lennon License; (4) testing Defendants' compliance with the Consent Order; and (5) bringing the contempt motion in bad faith. Defendants assert that this breach justifies setting aside the Consent Order.

Rule 60(b) provides in relevant part:

[T]he Court may relieve a party … from a[n] … order … for the following reasons: … (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party … (5) … it is no longer equitable that the judgment should have a prospective application; or (6) any other reason justifying relief from the operation of judgment.

Fed.R.Civ.P. 60(b).

The United States Supreme Court has "stressed that a district court should [set aside a judgment pursuant to Rule 60(b)] only in extraordinary circumstances." *Wilson v. Fenton*, 684 F.2d 249, 251 (3d Cir. 1982) (citing *Ackermann v. United States*, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950)). "This Circuit has consistently held that in order to grant a motion under Rule 60(b)(6), the movant must allege and prove such extraordinary circumstances as will be sufficient to overcome [the Court's] overriding interest in the finality of judgments."

*Wilson,* 684 F.2d at 251 (internal quotations and citations omitted); *see also Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 674 F.2d 976, 981 (3d Cir.1982). The party seeking to set aside a judgment or order must show that "without such relief, an extreme and unexpected hardship would occur." *Sawka v. Healtheast, Inc.,* 989 F.2d 138, 140 (3d Cir.1993).

 Defendants claim that the Lennon Estate's purported breaches of the Lennon License justify setting aside the Consent Order. The Third Circuit has held that breach of a settlement agreement does not constitute "extraordinary circumstances" under Rule 60(b)(6) justifying setting aside an order because a breach of a settlement agreement gives the aggrieved party the right to file a separate action on the agreement. *Sawka,* 989 F.2d at 140. Therefore, even if the Lennon Estate breached the Lennon License, Defendants merely have the right to pursue a separate action for breach of the License, but not a Rule 60(b)(6) motion. *Id.*[13] In any event, this argument is moot since Defendants have failed to show that the Lennon Estate breached the Lennon License or the Consent Order.

### A. *Implied Covenant of Good Faith and Fair Dealing*

Implied in every contract is the requirement that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of a contract." Williston on Contracts, Third Ed. § 670 (1961); *see also Tagare v. NYNEX Network Sys., Co.,* 921 F.Supp. 1146 (S.D.N.Y.1996). This concept is known as the implied covenant of good faith and fair dealing.

 Defendants claim that the Lennon Estate breached the implied covenant of good faith and fair dealing by: (1) extorting additional payments from ICS in connection with the purchase of stamps from IGPC; (2) unreasonably withholding approval of the submitted materials; (3) terminating the Lennon License; (4) attempting to provoke Defendants' breach of the Consent Order; and (5) bringing a motion for contempt. The Court will address each allegation separately.

#### 1. *Defendants' Claim of Extortion*

Defendants claim that the Lennon Estate breached the Lennon License because their counsel, Mr. Shukat, attempted to extract additional payments from Defendants in connection with Defendants' purchase of stamps from IGPC. Defendants claim that they only agreed to pay the Lennon Estate $7,500 in lieu of the royalty structure set forth in the Lennon License to save their relationship with the Lennon Estate. The Court finds that the Lennon Estate did not extort money from Defendants.[14]

Defendants' agreement to pay the Lennon Estate $7,500 in lieu of $11,700 in royalties was the product of two months of negotiations. The Lennon Estate obtained the $7,500 payment but in exchange, Defendants saved $4,200 in royalties that they would have had to pay under Paragraph 6(a) of the Lennon License. Defendant Tilson admitted that the agreement was a "business deal" which resulted from telephone "negotiations" and that ICS could benefit financially from the deal. (Jan. 13, 1998 Tr. at 72:23–24;

---

**13.** Other circuits have held that a court should set aside a settlement agreement when one party has committed a material breach. *See United States v. Baus,* 834 F.2d 1114, 1124 (1st Cir. 1987); *Fairfax Countywide Citizens Ass'n v. County of Fairfax,* 571 F.2d 1299, 1302–03 (4th Cir.1978).

**14.** Defendants argue that Plaintiffs have engaged in extortion. To assert a claim of extortion under New Jersey law, a plaintiff must allege that the extorter purposely and unlawfully obtains the property of another under threat of injury to person or property. *See United States v. De Cavalcante,* 440 F.2d 1264, 1276 (3d Cir.1971);

N.J. Stat. Ann. § 2C:20–5 (West 1995). The essence of extortion is duress. *See United States v. Addonizio,* 451 F.2d 49, 77 (3d Cir.1971). Furthermore, "[a] person extorts if he purposely threatens to ... [i]nflict ... harm which would not substantially benefit the actor but which is calculated to materially harm another person." N.J. Ann. § 2C:20–5. Defendants have not stated a claim of extortion because they have not alleged that Mr. Shukat made any threats in connection with his request of the $7,500 payment. In addition, they have not shown that they agreed to pay the $7,500 under duress.

98:2–22). Furthermore, Defendants had counsel available to them at all relevant times during negotiation of the $7,500 payment. In fact, prior to the consummation of the deal, Defendants' counsel spoke with Mr. Shukat directly regarding the IGPC stamps.

### 2. Approval of Materials Submitted by Defendants

Defendants claim that the Lennon Estate breached the Lennon License by unreasonably withholding approval of the materials that Defendants sent to Ms. Weber on August 5, 1997.

Pursuant to the terms of the Lennon License, the Lennon Estate may not unreasonably withhold approval of promotional materials. (Lennon License ¶ 3(a)(i)). The Lennon Estate did not approve the materials because shortly after Defendants submitted them, Ms. Weber, Ms. Ruggeri and Mr. Glick telephoned ICS and were able to place orders for Sell–Off Stamps even though they were not members of the Beatles/Lennon Club. Thus, the Lennon Estate had reason to believe that Defendants were violating the Consent Order. It was not unreasonable for the Lennon Estate to withhold approval of Defendants' materials when it was believed that Defendants were violating the Consent Order.

Furthermore, the Lennon Fact Book and the Lennon/Marx Fact Book contain several scandalous and defamatory statements about John Lennon and Mrs. Lennon. Mrs. Lennon had expressed her disapproval of the Lennon Fact Book, based on these inaccuracies. Therefore, Mrs. Lennon's disapproval of the Lennon Fact Book was reasonable and did not evidence bad faith.

### 3. Termination of the Lennon License

Defendants claim that the Lennon Estate had no basis for terminating the Lennon License based on Defendants' distribution of the Lennon Fact Book and the Lennon/Marx Fact Book. As shown in *supra* Part I.D, the Lennon Fact Book and the Lennon/Marx Fact Book were "promotional material which incorporates Licensor's Trademarks" (*see* Lennon License ¶ 3(a)(i)) and hence Defendants were required to obtain approval prior to their distribution. Defendants did not obtain the required approval; consequently, they breached Paragraph 3 of the Lennon License.

Paragraph 13(b) of the Lennon License provides that a breach of Paragraph 3 is "non-curable" and grounds for termination. Accordingly, the Lennon Estate had the right to terminate the Lennon License.[15]

### 4. Testing Compliance

Defendants assert that Plaintiffs, through Ms. Weber, persons acting under her direction and the James Mintz investigators, provoked Defendants' breach of Paragraph E of the Consent Order prohibiting the sale of Sell–Off Stamps to persons who were not members of the Beatles/Lennon Club. Defendants contend that Plaintiffs' investigators used misrepresentation, intimidation and unethical conduct in testing Defendants' compliance with Paragraph E.

Defendants have not produced a scintilla of evidence demonstrating that Plaintiffs' investigators intimidated ICS's sales representatives into selling them Sell–Off Stamps or provoked Defendants' breach of the Consent Order. Furthermore, as discussed *infra* Part III, the misrepresentations made by Plaintiffs' counsel and investigators were necessary to discover Defendants' violations of the Consent Order and did not constitute unethical behavior.

### 5. Contempt Motion

Defendants argue that Plaintiffs brought their motion for contempt in bad faith and this justifies setting aside the Consent Order pursuant to Rule 60(b). Defendants have not submitted any evidence showing that Plaintiff brought their contempt motion in bad faith. Moreover, pursuant to Paragraph O of

---

**15.** Even though a violation of Paragraph 3 of the Lennon License is non-curable and grounds for immediate termination, the Lennon Estate gave Defendants an opportunity to cure because Defendants had said that they were not distributing the Lennon Fact Book pending approval. However, Defendants continued to breach Paragraph 3 of the Lennon License by distributing the Lennon/Marx Fact Book even though they had never submitted it for approval or obtained approval.

the Consent Order, Plaintiffs had a right to bring an action to enforce their rights after they discovered that Defendants had breached "any provision" of the Consent Order. Finally, this Court's resolution of the motion seeking a finding of civil contempt belies a finding of bad faith.

### B. *Injustice to Defendants*

Defendants argue that they will suffer gross injustice if the Court does not set aside the Consent Order because they no longer derive any benefit from it. Defendants assert that they entered into the Consent Order in exchange for the exclusive Lennon License. Since the Lennon Estate terminated the Lennon License, the consideration which induced them to enter into the Consent Order no longer exists.

Defendants have paid Plaintiffs $97,500 and executed notes for an additional $140,000 payable over the next four years. When Plaintiffs filed their contempt motion in September 1997, Defendants voluntarily ceased sales of all stamps which they were allowed to sell under the Consent Order. Their right to sell certain of those stamps expired on February 28, 1998. Defendants spent $78,000 to purchase additional Lennon stamps from IGPC.[16] With the termination of the Lennon License, Defendants have no right to sell new stamps or to advertise any stamps to enable them to enroll additional Beatles/Lennon Club members to help them sell the Sell-off Stamps, which pursuant to the Consent Order they had a right to do until February, 1999.[17]

The parties agreed that a breach of Paragraph 3 of the Lennon License is non-curable and grounds for immediate termination. (*See* Lennon License ¶ 13(b)). Defendants breached Paragraph 3; therefore, the Lennon Estate had the right to terminate the Lennon License. The Court cannot set aside the Consent Order to avoid consequences resulting from Defendants' own breach.

### III. DEFENDANTS' MOTION FOR SANCTIONS

Defendants claim that Plaintiffs' counsel violated attorney disciplinary rules in connection with the purchase of Sell–Off Stamps by (1) speaking to ICS's sales representatives without the consent of ICS's counsel; and (2) not revealing to ICS's sales representatives that they were attorneys or persons acting under the direction of attorneys. Defendants claim this behavior violates three disciplinary rules: (1) the rule forbidding attorneys from engaging in deceitful conduct (Rule 8.4(c)); (2) the rule restricting attorneys from communicating with parties represented by counsel concerning the subject of the representation (Rule 4.2); and (3) the rule regarding an attorney's dealings with an unrepresented party (Rule 4.3). Both New York and New Jersey have disciplinary rules proscribing such behavior by attorneys.

### A. *Choice of Law*

The parties disagree as to which jurisdiction's disciplinary rules apply. Defendants claim that since the parties are represented by counsel who practice principally in New York, the Court should apply the New York Rules of Professional Responsibility. Plaintiffs argue that New Jersey's Rules of Professional Conduct ("RPC") apply to counsels' conduct in a proceeding before the District of New Jersey.

Plaintiffs refer the Court to ABA Model Rules of Professional Conduct, Rule 8.5. New Jersey's version of Rule 8.5 provides that "[a] lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction although engaged in practice elsewhere." The 1993 Amendment to ABA Model Rule 8.5 provides in part:

> In any exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be as follows: (1) for conduct in connection with a proceeding in a court before which a

---

16. Since the Lennon Estate terminated the Lennon License, IGPC has agreed to allow Defendants to return the IGPC stamps to them. According to Defendants, IGPC will refund most, if not all, of the $78,000.

17. In light of this Court's finding of civil contempt against Defendants', they may no longer sell the Sell–Off Stamps.

lawyer has been admitted to practice (either generally or for purposes of that proceeding), the rules to be applied shall be the rule of the jurisdiction in which the court sits, unless the rules of the court provide otherwise . . .

ABA Model Rule 8.5(b)(1). New Jersey has not yet adopted this 1993 amendment. However, when there is no controlling precedent in New Jersey regarding the application of a choice of law rule to a legal ethics case, the Court is empowered to fashion its own rule. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 911 F.Supp. 148, 151 (D.N.J. 1995) (where neither New Jersey RPC 8.5 nor the New Jersey Supreme Court dictate which ethics rules the court should apply, the district court is authorized to fashion its own choice of law rule); *see also* L. Civ. R. 103.1(a).[18]

■ New Jersey's Rules of Professional Conduct apply to an attorney's conduct "in connection with a proceeding" in New Jersey, even if the conduct at issue took place outside of the jurisdiction and even if the attorney's practice is located outside of New Jersey. *See In re Prudential*, 911 F.Supp. at 151 (applying ABA Model Rule 8.5 and holding that it would enforce only New Jersey ethics rules to conduct in connection with a proceeding in New Jersey, "[a]lthough another jurisdiction may obviously exercise concurrent control over the members of its bar.").

■ Defendants argue that ABA Model Rule 8.5(b)(1) does not apply unless the proceeding is pending and there was no proceeding pending at the time of Plaintiffs' investigation. This argument is without merit. Rule 8.5(b)(1) applies to "conduct in connection with a proceeding" whether or not the proceeding is still pending. Furthermore, the conduct at issue was directly related to

enforcement of the Consent Order over which this Court has continuing jurisdiction.[19]

### B. New Jersey RPC 4.2

■ New Jersey's attorney disciplinary rules prohibit an attorney from communicating with represented parties concerning the subject of the representation. RPC 4.2 states in relevant part:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows or by the exercise of reasonable diligence should know to be represented by another lawyer in the matter including members of an organization's litigation control group as defined by RPC 1.13 unless the lawyer has the consent of the other lawyer, or is authorized by law to do so . . .

RPC 4.2 (as amended effective September 1, 1996). RPC 1.13 states in relevant part:

> For the purposes of RPC 4.2 . . . the organization's lawyer shall be deemed to represent not only the organizational entity but also the members of its litigation control group. Members of the litigation control group shall be deemed to include current agents and employees responsible for or significantly involved in the determination of the organization's legal position in the matter whether or not in litigation, provided however, that significant involvement requires involvement greater and other than the supplying of factual information or data respecting the matter.

The Comments to RPC 4.2 make it clear that the only persons represented by an entity's attorney are those that fall within the "litigation control group" as defined by RPC 1.13. *See* Pressler, Current N.J. Court Rules, Comment R.1:14[2] (Gann 1997) ("The thrust

---

**18.** Local Civil Rule 103.1 provides:

(a) The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law.

**19.** A federal court has continuing jurisdiction to enforce a settlement agreement when it incorporates the agreement into its judgment or order. *See Sawka v. Healtheast, Inc.*, 989 F.2d 138 (3d Cir.1993). Here, the Consent Order was the judgment of this Court which dismissed the underlying litigation without prejudice. (*See* Consent Order ¶ S). Thus, this Court has continuing jurisdiction over the pending motions.

of the amendments is to define the persons represented by the entity as its litigation control group.").[20]

RPC 4.2 "seeks to protect the lay person who may be prone to manipulation by opposing counsel." *Michaels v. Woodland,* 988 F.Supp. 468, 470 (D.N.J.1997). It was intended to "prevent situations in which a represented party may be taken advantage of by adverse counsel; the presence of the party's attorney theoretically neutralizes the contact." *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990); *see also Weider Sports Equipment Co., Ltd. v. Fitness First, Inc.,* 912 F.Supp. 502 (D.Utah 1996) (Rule 4.2 was designed to avoid "artful" legal questioning). "It is not the purpose of [RPC 4.2] to protect a corporate party from the revelation of prejudicial facts." *Weider,* 912 F.Supp. at 510. To read RPC 4.2 broadly

> could prevent any pretrial inquiry that would gather evidence from an employee of an organization. In most instances, this would block acquisition of important evidence about corporate practices, e .g. civil right violations, age discrimination, improper corporate or labor practices, improper commercial practices, and frauds. This application of Rule 4.2 would preclude, prior to litigation, the gathering of the necessary factual information to determine if a valid claim for relief could be maintained and in its most exaggerated context leave a party without a factual basis to assert an avenue of redress.

*Id.* at 508; *see also Johnson v. Cadillac Plastic Group, Inc.,* 930 F.Supp. 1437 (D.Colo.1996) (Rule 4.2 must "remain[ ] a rule of ethics, rather than of corporate immunity" and to read the rule expansively would "stifle[ ] the truth-seeking function of courts and treat[ ] corporate employees as a form of company property").

Defendants' sales representatives do not fall within the "litigation control group" as defined by RPC 1.13. The sales representatives were not "responsible for or significantly involved in the determination of [ICS]'s legal position in the matter." *See* RPC 4.2. Furthermore, to be part of the litigation control group, the sales representatives would have had to do more than merely "supply[ ] ... factual information or data respecting the matter" which they clearly did not do. *Id.* Since the sales representatives were "not within the litigation control group and ha[d] not obtained other representation, *ex parte* contact is permitted" under RPC 4.2.[21] *Michaels,* 988 F.Supp. at 472.

There is no evidence that any of Plaintiffs' investigators asked the sales representatives any questions about instructions given or received with regard to Beatles/Lennon stamps. Plaintiffs' investigators did not ask the sales representatives about Defendants' practices or their own practices or policies with regard to Beatles/Lennon stamps. The sales representatives' communication with Plaintiffs' counsel and investigators were limited to recommending which stamps to purchase and accepting an order for Sell–Off Stamps. The investigators did not ask any substantive questions other than whether they could order the Sell–Off Stamps. The only misrepresentations made were as to the callers' purpose in calling and their identities. They posed as normal consumers. The investigator did not make any misrepresentation that he or she was a Beatles/Lennon Club member. In most instances, Plaintiffs' investigators told the sales representative that he or she was not a Beatles/Lennon Club member. Furthermore, Defendants charged all of Plaintiffs' investigators' the higher, non-member price for the Sell–Off Stamps.

RPC 4.2 cannot apply where lawyers and/or their investigators, seeking to learn

---

**20.** In so amending RPC 4.2, New Jersey rejected the test applied in *In re Prudential,* 911 F.Supp. 148, based on whether an employee's conduct may directly impute liability to the corporation. *See* Report of the Special Supreme Court Committee on RPC 4.2, 139 N.J. L.J. 1161 (1995), at 14 (those persons who are deemed to be represented by the corporation's attorney and who may not be communicated with ex parte do "not

include persons whose actions bind the organization or are imputable to the organization ... unless they meet the 'legal position' test").

**21.** However, the *ex parte* contact must be conducted in accordance with RPC 4.3. *See infra* Part III.D.

about current corporate misconduct, act as members of the general public to engage in ordinary business transactions with low-level employees of a represented corporation. To apply the rule to the investigation which took place here would serve merely to immunize corporations from liability for unlawful activity, while not effectuating any of the purposes behind the rule. *See, e.g., Weider,* 912 F.Supp. 502. Accordingly, Ms. Weber's and Plaintiffs' investigators' communications with Defendants' sales representatives did not violate RPC 4.2.

### C. New Jersey RPC 8.4(c)

■ The attorney disciplinary rules prohibit an attorney from engaging in deceitful conduct. RPC 8.4(c) states that an attorney may not engage in conduct involving "dishonesty, fraud, deceit or misrepresentation." RPC 8.4(c) is not by its terms limited only to material representations. It applies to lawyers not only when they are acting as lawyers but also when they are acting otherwise than in a lawyerly capacity. *See* David B. Isbell & Lucantonia N. Salvi, *Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers; An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct,* 8 Geo. J. Legal Ethics 791, 816 (1995).[22] However, RPC 8.4(c) does not apply to misrepresentations solely as to identity or purpose and solely for evidence-gathering purposes. *Id.* at 812, 816–18.

Undercover agents in criminal cases and discrimination testers in civil cases, acting under the direction of lawyers, customarily dissemble as to their identities or purposes to gather evidence of wrongdoing. This conduct has not been condemned on ethical grounds by courts, ethics committees or grievance committees. *Id.* at 792–94. This limited use of deception, to learn about ongoing acts of wrongdoing, is also accepted out-

side the area of criminal or civil-rights law enforcement. *Id.* at 794–795, 800; *see also* Green Declaration ¶ 7.[23] The prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator to detect ongoing violations of the law is not ethically proscribed, especially where it would be difficult to discover the violations by other means. (Green Declaration ¶¶ 6–7).

Courts which have addressed the issue have approved of attorneys' use of undercover investigators who pose as interested tenants to detect housing discrimination or as prospective employees to detect employment discrimination. *See* Isbell & Salvi, *supra,* 8 Geo. J. Legal Ethics at 799; *Richardson v. Howard,* 712 F.2d 319, 321–22 (7th Cir.1983) (observing that the evidence provided by testers is frequently indispensable and that the requirement of deception is a relatively small price to pay to defeat racial discrimination); *see also Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526 (7th Cir.1990); *Wharton v. Knefel,* 562 F.2d 550, 554 n. 18 (8th Cir.1977); *Hamilton v. Miller,* 477 F.2d 908, 909 n. 1 (10th Cir.1973).

■ Plaintiffs could only determine whether Defendants were complying with the Consent Order by calling ICS directly and attempting to order the Sell–Off Stamps. If Plaintiffs' investigators had disclosed their identity and the fact that they were calling on behalf of Plaintiffs, such an inquiry would have been useless to determine ICS's day-to-day practices in the ordinary course of business.

■ Furthermore, the literal application of the prohibition of RPC 8.4(c) to any "misrepresentation" by a lawyer, regardless of its materiality, is not a supportable construction of the rule. The language of RPC 8.4(c) must be interpreted in the context of the statutory scheme of which it is a part. In

**22.** David B. Isbell is the former chair of the American Bar Association Standing Committee on Ethics and Professional Responsibility.

**23.** Professor Bruce A. Green is the co-chair of the ABA Litigation Section's Committee on Ethics and Professionalism. He also serves as vice-chair of the New York State Bar Association's

Committee on Professional Ethics and is a member of the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department. Professor Green has published more than 20 articles in the area of legal ethics.

this regard, it is significant to take note of RPC 4.1(a) which provides that "[i]n the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person ..." If the drafters of RPC 8.4(c) intended to prohibit automatically "misrepresentations" in all circumstances, RPC 4.1(a) would be entirely superfluous. As a general rule of construction, however, it is to be assumed that the drafters of a statute intended no redundancy, so that a statute should be construed, if possible, to give effect to its entire text. *U.S. v. Nordic Village,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (it is a "settled rule that a statute must, if possible, be construed in such a fashion that every word has some operative effect"); *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative"); *Commonwealth of Pennsylvania Dep't. of Pub. Welfare v. United States Dep't. of Health & Human Svcs.,* 928 F.2d 1378, 1385 (3d Cir.1991).

As stated by Mr. Isbell and Professor Salvi:

> That principle [of statutory construction] would require that Rule 8.4(c) apply only to misrepresentations that manifest a degree of wrongdoing on a par with dishonesty, fraud, and deceit. In other words, it should apply only to grave misconduct that would not only be generally reproved if committed by anyone, whether lawyer or nonlawyer, but would be considered of such gravity as to raise questions as to a person's fitness to be a lawyer. Investigators and testers, however, do not engage in misrepresentations of the grave character implied by the other words in the phrase [dishonesty, fraud, deceit] but, on the contrary, do no more than conceal their identity or purpose to the extent necessary to gather evidence.

Isbell & Salvi, *supra,* 8 Geo. J. Legal Ethics at 817. Accordingly, Plaintiffs' counsel and investigators did not violate RPC 8.4(c).

### D. *New Jersey RPC 4.3*

The attorney disciplinary rules also restrict an attorney's communications with an unrepresented party. New Jersey RPC 4.3 specifically provides protection for unrepresented employees. RPC 4.3 states that:

> In dealing on behalf of a client with a person who is not represented by counsel, *a* lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding ...

■ It is clear from the language of RPC 4.3 that it is limited to circumstances where an attorney is acting in his capacity as a lawyer—"dealing on behalf of a client." *See* RPC 4.3, *see also* Isbell & Salvi, *supra,* 8 Geo. J. Legal Ethics at 824. Therefore, its prohibitions on allowing the unrepresented person to misunderstand that the lawyer is disinterested only apply to a lawyer who is acting as a lawyer. *Id.* at 825. Like RPC 4.2, RPC 4.3 was intended to prevent a lawyer who fails to disclose his role in a matter from taking advantage of an unrepresented third party. *See Michaels,* 988 F.Supp. at 470.

■ Plaintiffs' counsel and investigators in testing compliance were not acting in the capacity of lawyers. Therefore, the prohibitions of RPC 4.3 do not apply here. RPC 4.3 does not apply to straightforward transactions undertaken solely to determine in accordance with Rule 11 of the Federal Rules of Civil Procedure, the existence of a well-founded claim—in this case a claim of contempt.

Accordingly, Defendants' motion for sanctions is denied.

### ORDER

This matter having come before the Court on the motion for contempt of Gold, Farrell & Marks, counsel for plaintiffs Apple Corps Limited, MPL Communications, Inc., Yoko Ono Lennon as executrix of the estate of John Lennon, Subafilms, Ltd. and Yoko Ono Lennon (collectively "Plaintiffs"); and it appearing that the other motions before the Court are the motion for sanctions and the

motion to dissolve the Consent Order of Dewey Ballantine, LLP, counsel for defendants International Collectors Society, John E. Van Emden, Scott L. Tilson, Jeffrey B. Franz and Howard E. Friedman (collectively "Defendants"); and the Court having considered the submissions of the parties; and good cause appearing;

IT IS on this 26th day of June, 1998,

ORDERED that Plaintiffs' motion for contempt pursuant to Paragraph O of the Consent Order is granted;

IT IS FURTHER ORDERED that Defendants' motion to dissolve the Consent Order is denied;

IT IS FURTHER ORDERED that Defendants' motion for sanctions is denied;

IT IS FURTHER ORDERED that Defendants are permanently enjoined from selling any Stamps as defined in the Consent Order;

IT IS FURTHER ORDERED that Defendants shall reimburse Plaintiffs for all their costs, including reasonable attorneys' fees incurred in bringing their motion for contempt;

IT IS FURTHER ORDERED that Plaintiffs shall have fourteen (14) days from the date of this Order to submit an application for costs and attorneys' fees;

IT IS FURTHER ORDERED that Defendants shall have seven (7) days after receipt of Plaintiffs' application for costs and attorneys' fees to submit opposition thereto; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.